Missionary Society *v.* Dalles.

1. Under the act of Aug. 14, 1848, c. 177, entitled "An Act to establish the territorial government of Oregon," a religious society acquired no title to public lands by reason of its occupation of them as a missionary station among the Indian tribes, unless such occupation actually existed at that date.

2. Where, therefore, a religious society appropriated certain lands in the Territory of Oregon, erected improvements thereon and occupied them for such a missionary station, but its occupation ceased before that date, and a portion of them, after the town-site acts took effect, was, pursuant to their provisions, entered and paid for, and another portion was claimed by a party who had fully complied with the requirements of the act of Sept. 27, 1850, c. 76, commonly called the Donation Act, — *Held*, that the society to which by reason of such occupation a patent had been issued held the title to such portions in trust for the parties claiming respectively under the donation and the town-site acts.

3. Prior to the said act of Sept. 27, 1850, no person could, by entry or preemption settlement, acquire as against the United States any right or title to public land in Oregon. *Stark* v. *Starrs*, 6 Wall. 402, cited upon this point and approved.

APPEAL from the Circuit Court of the United States for the District of Oregon.

This was a bill in equity filed by Dalles City, against the Missionary Society of the Methodist Episcopal Church.

The following facts are disclosed by the pleadings and evidence: The complainant was incorporated by an act of the legislature of Oregon passed Jan. 26, 1857, which was amended by an act passed Jan. 20, 1859. By the last-named act the boundaries of the city were established. A large portion of the land within them was, in the year 1852, settled upon and occupied, not for agricultural uses, but as a town site for the purposes of business and trade, and it has been so occupied ever since. During the year 1855 the lawfully constituted authorities of the county, within which the city was situate, caused the land so occupied to be surveyed and platted into lots, blocks, streets, and alleys, and the plat thereof to be recorded in the recorder's office of the county. A survey made by the United States of the land was approved Feb. 4, 1860, and the corporate authorities of the city entered, April 19, 1860, at the land-office of the United States, the land, being the fractional northwest quarter of section three, in township one, of range thirteen east, containing one hundred and twelve

acres, in trust for the several use and benefit of the occupants thereof, according to their respective interests. All this was done in pursuance of the act of July 17, 1854, c. 84, by which the provisions of the act of May 23, 1844, c. 17, were extended to the Territory of Oregon. The fractional quarter is the land occupied by the city as a town site. The corporate authorities paid therefor to the receiver of the land-office one dollar and twenty-five cents per acre, and the city claims that it thereby acquired title thereto in trust as aforesaid.

The Missionary Society of the Methodist Episcopal Church, a corporation organized under the laws of the State of New York, claims to own in fee-simple a tract of land containing six hundred and forty-three acres and thirty-seven hundredths of an acre, for which a patent bearing date July 9, 1875, was issued to it by the United States. The land described in the patent includes the fractional quarter in question.

The city, by the bill filed in this case, asserts the validity of its title to the fractional quarter, and avers that, in violation of its rights, the patent was improvidently issued to the Missionary Society. It prays for a decree, declaring it to be the owner of the fractional quarter in trust for the use and benefit of the owners and occupants thereof, and directing the defendant to convey the legal title in and to the land to the city, to be held by it in trust for the respective occupants thereof.

The remaining facts are set forth in the opinion of the court.

Upon final hearing, the Circuit Court rendered a decree in favor of the city, in accordance with the prayer of the bill. This appeal is prosecuted to reverse that decree.

*Mr. E. L. Fancher* for the appellant.

The record establishes beyond controversy that the Methodist Missionary Society founded a missionary station at The Dalles in 1836, and labored among the Indians there until September, 1847. The society then provided for a continued occupation of the station, for the purposes for which it had been established, by annexing to the permitted occupancy of it by the American Board of Commissioners for Foreign Missions *an express condition* that such missionary work should

be continued there as usual. In November following, Dr. Whitman, the superintendent of the station, and others were murdered, and his employés fled from the station. The Cayuse war was then waging. By reason of Indian hostilities, the society was prevented from reoccupying the station in the strict sense of having its missionaries there actually treading the soil until the spring of 1850. The United States troops, at the breaking out of that war, took possession of the mission buildings, established a post there, and reserved for military uses three hundred and fifty acres within the limits of the tract claimed and surveyed by the Missionary Society. Congress, by an act passed in June, 1860, indemnified the society for the land thus taken. The remainder which is now in controversy is therefore claimed under a title which Congress recognized to be valid. There were no rival claimants until after the land had been surveyed, and the survey filed in the proper office. It is submitted, —

1. There having been an actual and uninterrupted possession of the land for missionary purposes from 1836, until the compulsory cesser of occupation by reason of Indian hostilities, there was, in the absence of any adverse possession or claim, an occupation of the land within the meaning of the confirmatory act of 1848. The title of the society drew to it the possession, although at the date of the act there was not an actual *pedis possessio.*

2. The society, if it acquired a right to the lands, was entitled to a patent therefor. It was the province of the Land Department to determine whether the facts which authorized the issue of the patent existed, and its finding on that question is conclusive. *Quinby* v. *Conlan,* 104 U. S. 420.

*Mr. John H. Mitchell* and *Mr. James K. Kelly* for the appellee.

MR. JUSTICE WOODS delivered the opinion of the court.

It is clear, and does not seem to be disputed, that the title of the appellee to the fractional quarter of land described in the bill is good and valid against all the world except the appellant, the Missionary Society of the Methodist Episcopal Church. It was acquired by virtue of an entry made at the

proper land-office, in pursuance of the provisions of the act of May 23, 1844, c. 17, and the act of July 17, 1854, c. 84. The controversy arises upon the claim of the appellant, which contends that its title is better and superior to that of the appellee.

The patent from the United States to the appellant for the land was issued by virtue of sect. 2447 of the Revised Statutes, and, as directed by that section, declares as follows: " That this patent shall only operate as a relinquishment of title on the part of the United States, and shall in no manner interfere with any valid adverse right to the same land, nor be construed to preclude a legal investigation and decision by the proper judicial tribunal between adverse claimants to the same land."

It is, therefore, clear that the patent does not conclude this controversy, and that if the United States had, at the date of the patent, no title to the lands described therein, the patent conveyed none. But both parties contend that they acquired the title of the United States long before the date of the patent. As the appellee is conceded to have *prima facie* a good title, the appellant is driven to show a better title, independently of the patent. This it has undertaken to do. The only question in the case, therefore, is, has it succeeded in establishing a title to the premises superior to that under which the appellee claims, and by virtue of which it is in possession.

The appellant asserts title under the provisions of the first section of the act of Aug. 14, 1848, c. 177, entitled " An Act to establish the territorial government of Oregon," which, among other things, declares: " That the title to the land, not exceeding six hundred and forty acres, now occupied as missionary stations among the Indian tribes in said Territory, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations respectively belong." The appellant contends that on that date it was, within the meaning of the statute, occupying the land now in dispute as a missionary station among the Indian tribes of Oregon. Whether this contention is well founded is the turning-point of the controversy.

It appears from the testimony in the record that in the

year 1836 or 1837 a missionary station was established by the Missionary Society of the Methodist Episcopal Church, under the superintendence of Rev. Jason Lee, on the land now in controversy, situate on the Columbia River, east of the Cascade Mountains, at a place then called Wascopum, but since then known as The Dalles. In 1844 Lee was succeeded by Rev. George Gary, who continued to be the superintendent of the station until July, 1847, when he was succeeded by Rev. William Roberts. At this time there were at the station a two-story dwelling-house, a school-house, which was used also as a church, a store-house with cellar underneath, a barn, some farming land enclosed, and farming utensils.

In August, 1847, Mr. Roberts, being still the superintendent of the station, transferred it to Dr. M. Whitman, a missionary of the society known as the American Board of Commissioners for Foreign Missions. An account of this transfer is given in the testimony of Mr. Roberts, as follows: —

"In August, 1847, I transferred the said station into the hands of Dr. M. Whitman at the assent of the A. B. C. F. M. The mission station was placed in his hands on the conditions and with the understanding that it should be occupied by them for the use and benefit of the Indians residing in that place and vicinity. For the movable property they were to pay such an amount as might mutually be agreed upon. For the station itself they were to give no compensation, the understanding being all the while that the mission was to be maintained by them for the use and benefit of the Indians in a religious point of view, which included the education of the children, the instruction of the Indian parents in all matters pertaining to their religious interests and temporal well-being. The reasons for the transfer without compensation were briefly these: The Methodist mission had but one station east of the Cascades and more work in the Willamette than they could well attend to. The American Board had three stations in the upper country, and it was quite desirable for them to have The Dalles also, as it was the key to that entire region, and as an act of Christian regard and confidence the transfer was thus made.

" The amount which Dr. Whitman was to pay for the mov-

able property was subsequently fixed at a fraction over six hundred dollars. This included a large canoe, farming utensils, fanning-mill, some wheat," &c.

Payment of the $600 was made by a draft drawn by Dr. Whitman, dated in September, 1847, upon the American Board.

Mr. Roberts, Rev. Alvin F. Waller, and Mr. Brewer, the latter two, up to the date of the transfer, having been in the occupancy of the mission, left the station immediately after the transfer and went down the Columbia River. They carried off their movable property which had not been sold to Dr. Whitman. Dr. Whitman, to whom the station had been transferred, remained there a few days and then returned to his home at Wailatpu, distant about one hundred and forty miles. He left his nephew, Perrin B. Whitman, a youth seventeen years of age, at The Dalles in possession of the buildings which had been occupied by the Methodist missionaries. On Nov. 29, 1847, Dr. Whitman was, with his family and a number of other persons, murdered by the Cayuse Indians at his home at Wailatpu. When news of this massacre reached Perrin B. Whitman, he abandoned The Dalles and went down the Columbia River, leaving no one in the occupancy of the station.

After the transfer of the station by Roberts to Whitman in August, 1847, the record does not show that any missionary labors were ever performed at The Dalles, either by the Methodist Society or the American Board, except two or three religious services held by Mr. Waller in June, 1850, when he went to The Dalles to show Mr. Roberts the boundaries of the mission claim. After the month of August, 1847, no person representing the Methodist Missionary Society, and after December, 1847, no person representing the American Board, ever occupied the missionary station at The Dalles.

The reason assigned by the appellant why the American Board abandoned the station and why possession of it was not resumed by the Methodist Society was the fear of Indian hostilities.

It follows that on Aug. 14, 1848, when the act to organize the Territory of Oregon was passed, the station was not in the occupancy of any one representing either of the missionary societies.

About the last of February or the first of March, 1849, Messrs. Walker, Spaulding, and Eels, three missionaries of the American Board, delivered a writing to Mr. Roberts, in which they "offered for his acceptance the mission station at Wascopum, near the Grand Dalles of the Columbia River," and proposed "that it be retransferred to the Oregon Mission of the Methodist Episcopal Church in the same manner in which it was received by the Oregon Mission of the American Board of Commissioners for Foreign Missions." The draft given to Mr. Roberts for the movable property at the Dalles, sold by him to Dr. Whitman in August, 1847, was delivered up, it having never been paid.

The appellant did not resume missionary work at The Dalles after this attempt to retransfer, nor did it take possession of the premises.

In June, 1850, Mr. Roberts returned to The Dalles for the purpose of making a survey of the six hundred and forty acres which he proposed to claim for the Missionary Society of the Methodist Episcopal Church under the act of 1848. He made a survey and had it recorded.

On Feb. 28, 1859, several years after the lands in controversy had been entered and paid for by Dalles City, the American Board delivered to the Missionary Society of the Methodist Episcopal Church a release of all their right and title to "the property in the vicinity of The Dalles on the Columbia River, known as the 'mission property.'"

The question is presented whether, upon these facts, the appellant, the Missionary Society of the Methodist Episcopal Church, has shown a better title to the lands in controversy than that of Dalles City, the appellee.

The title claimed by the appellant is based entirely upon the first section of the act of Aug. 14, 1848, before referred to. This was a public grant. In *Dubuque & Pacific Railroad Co.* v. *Litchfield*, 23 How. 66, it was said by this court, speaking of a public grant of land: "All grants of this description are strictly construed against the grantees. Nothing passes but what is conveyed in clear and explicit language." See also *Jackson* v. *Lamphire*, 3 Pet. 280; *Beaty* v. *Lessee of Knowler*, 4 id. 152; *Providence Bank* v. *Billings*, id. 514;

*Charles River Bridge* v. *Warren Bridge*, 11 id. 420; *Leaven-worth, &c. Railroad Co.* v. *United States*, 92 U. S. 733.

The act of Aug. 14, 1848, confirms and establishes title to land occupied at the date of the act as missionary stations among the Indian tribes. The words are "now occupied." To occupy means to hold in possession; to hold or keep for use; as to occupy an apartment. Webster's Dictionary. The appellant contends that this act confers title on it for lands which it did not occupy at the date of the act, but which it had voluntarily abandoned eleven months before, and the occupancy of which it never resumed, either for missionary or any other purposes. Not even a liberal construction would support such a claim.

But the appellant, conceding that it was not in the actual occupancy of the premises, either as a missionary station or otherwise, at the date of the passage of the act, nevertheless insists that, being in actual occupancy in August, 1847, it transferred its rights therein to the American Board, on condition that the latter society should maintain a mission there for the benefit of the Indians, and that, as the American Board failed to maintain such a mission and abandoned the premises, the rights of the appellant reverted to it, and it, therefore, had a constructive possession when the act of Aug. 14, 1848, was passed, which brought it within the meaning of the act.

We do not think this contention can be sustained. In the first place, it cannot be fairly inferred from the testimony in the record that the transfer of the missionary station was a conditional one, and that it was any part of the contract that the rights of the appellant should revert to it if the condition were broken. It is plain that the transfer was absolute. Doubtless it was the expectation of the appellant that the transferee would conduct upon the premises a mission for the religious benefit of the Indians, and such doubtless was the purpose of the American Board. But it does not appear to have been any part of the contract that, if the American Board failed to carry on such a mission, the appellant should resume possession.

But conceding that such was the understanding between the

parties, there is still a fatal obstacle to any claim on the part of the appellant.   When the appellant was in the occupancy of the premises in controversy, and when it made the transfer of possession in August, 1847, and until the passage of the said act of Aug. 14, 1848, that part of the country was without an organized territorial government under the laws of the United States.   The public domain included within the Territory of Oregon by the act just mentioned had not then been surveyed, nor was it open to settlement, pre-emption, or entry. *Stark* v. *Starrs*, 6 Wall. 402.   The title was in the United States, subject to the possessory Indian title to portions of the Territory, and there was no law by which any person or company could acquire title from the government.   All persons, therefore, who settled upon the public lands acquired no rights thereby as against the government.   They were merely tenants by sufferance.   The most they could claim was the right of actual occupancy as against other settlers.   Such an occupant could yield his right of actual possession to another settler, but he could convey no other interest in the land.   If he abandoned the land and another settler occupied it, the former lost all right to the possession.   If he transferred the possession to another and the transferee abandoned the land, the first possessor could claim no right in the land unless he again took actual possession.   In short, the settler had no right as against the government, and no rights under the laws of the United States as against any one else to the possession of the land in his actual occupancy, except and only so long as such occupancy continued.

It is true that before the passage of the act of Aug. 14, 1848, to organize a territorial government for Oregon, the people of that Territory had, in June and July, 1845, met by their delegates in convention and adopted laws and regulations for their government " until such time," as they declared, " as the United States of America extend jurisdiction over us."   In this plan of government it was provided that any one wishing to establish a claim to land should designate the extent of his claim by line marks, and have it recorded in the office of the territorial recorder.   The appellant cannot derive any title from this regulation, for it never defined the extent of its claim

by boundaries and never recorded the same, as required by the regulation, until long after the passage of that act, the fourteenth section of which declares as follows: "All laws heretofore passed in said Territory making grants of land, or otherwise affecting or incumbering the title to lands, shall be, and are hereby declared to be, null and void."

Referring to this act, this court declared in *Lownsdale* v. *Parrish*, 21 How. 290, that Congress passed no law in any wise affecting title to lands in Oregon till the passage of the act of Sept. 27, 1850, c. 76, and that prior to that date no one could acquire any title to or interest in the public lands in that Territory.

It follows that there could be no constructive possession of the public lands. When, therefore, in August, 1847, the appellant voluntarily abandoned its possession of the lands in controversy to another missionary society, it lost every shadow of claim thereto. Its right was a mere possessory right, without other title. It had no rights which it could reserve. When the American Board, in December, 1847, abandoned the lands in controversy the appellant had no rights therein. The reasons which induced the abandonment of the lands by the missionary societies, whether a new policy on the part of the appellant or fear of the Indians on the part of the American Board, are entirely immaterial. When the lands were abandoned for any reason all right in them was lost, and they were open to the occupancy of any one who might choose to take and hold them.

The method adopted by the appellant to turn over the station to the American Board by an actual transfer of possession was as effectual as any could be. It could be done only by yielding the actual occupancy, and this could not be effected by a written transfer. It could be accomplished only by the going out of one party and the going in of the other.

If the appellant had, in August, 1847, executed the most formal deed, conveying the lands to the American Board, and had stipulated therein that on failure of the latter to maintain a mission thereon for the benefit of the Indians, or upon its abandonment of the lands, all the rights of the appellant should revert to it, and it should be entitled to resume immediate

possession, such a writing would have been inoperative and futile. The appellant had no rights in the land which it could convey, and no rights which it could reserve.

These views are supported by *Stringfellow* v. *Cain*, 99 U. S. 610, brought up from the Territory of Utah. The act of March 2, 1867, c. 177, "for the relief of the inhabitants of cities and towns upon the public lands," provides that whenever any portion of the public lands of the United States has been or shall be settled upon and occupied as a town site, and therefore not subject to entry under the agricultural pre-emption laws, it shall be lawful for the authorities of the town to enter the lands so settled and occupied in trust for the several use and benefit of the occupants thereof, the execution of which trust to be conducted under such rules as the legislature of the State or Territory may prescribe. Under this act, it was held in that case that where a party had been in the occupancy of a lot, but prior to the passage of the act voluntarily withdrew therefrom and gave it up to others, the rights, which depended on keeping the possession, were gone.

The appellant contends that the language of the first section of the act of Aug. 14, 1848, under which it claims, implies that it had some title to the lands in question before the act was passed. It places stress on the words " that the title to the lands be confirmed and established in the several religious societies to which said missionary stations respectively belong," and says there must have been some previous title which could be confirmed and established.

We have seen that it was not possible to acquire any title as against the United States before the passage of this act. If, therefore, the force is to be given to the words of the statute which the appellant claims for them they must refer to the possessory title under the regulations above mentioned of the provisional government. But no steps, as we have seen, were taken by appellant to establish its claim under those regulations. It had simply settled upon the public domain as a tenant by sufferance, without authority of any law or regulation of any government, and had done no act by which it could acquire any claim of title. Whatever, therefore, may have been

the case with other missionary societies, the appellant had no title of any kind which could be confirmed and established by the act. The American Board was in no better position.

Neither of the societies acquired any title under the act of 1848. The writing executed in 1849 by Messrs. Walker, Spaulding, and Eels, and the release made by the American Board to the appellant in 1859, after Dalles City had entered and paid for the land, and the patent of the United States in 1875, which was a mere release, conveyed no rights in the lands in controversy to the appellant.

The decree of the Circuit Court was, therefore, right, and must be

*Affirmed.*

NOTE. — *Missionary Society* v. *Kelly.* *Missionary Society* v. *Wait.*

Appeals from the Circuit Court of the United States for the District of Oregon.

These cases were submitted at the same time and by the same counsel as was the preceding case.

MR. JUSTICE WOODS delivered the opinion of the court.

These cases were in all respects similar to *Missionary Society* v. *Dalles, supra,* p. 336, except that the appellees claimed under a title different from that relied on by Dalles City. So far as the title of the appellant is concerned, they and that case were tried upon the same evidence. It follows, that if the appellees in these cases show an equitable title in themselves, the decree should be affirmed. This they have done. They all claim title under one Winsor D. Bigelow, whose title was derived under the act of Sept. 27, 1850, c. 76, commonly called the Donation Act. This act gave, upon certain conditions, to every white settler upon the public lands, being a citizen of the United States, above the age of eighteen years, a half section of land if he were a single man, and a whole section if he were a married man. The record clearly shows a full compliance by Bigelow with the law, and establishes his right to the lands in controversy, which he afterwards conveyed to the appellees in these cases. The decree of the Circuit Court in each of these cases, which is similar to the decree in that case, is therefore right and should be affirmed; and it is

*So ordered.*