CORPORATION OF THE CATHOLIC BISHOP OF NESQUALLY *v.* GIBBON *et al.*,
(UNITED STATES, Intervenor.)

*(Circuit Court, D. Washington, W. D.*   November 3, 1890.)

1. PUBLIC LANDS—ORGANIC ACT OF OREGON—MISSIONARY STATIONS.
   The proviso in the organic act of Oregon territory, confirming titles to the land not exceeding 640 acres then occupied as missionary stations among the Indian tribes, in the religious societies to which said missionary stations respectively belonged, must be construed as a grant of only the specific lands which were at the date of the act so occupied, exclusively, and not in subserviency to another's right.

2. SAME—GRANT CONSTRUED—POSSESSION.
   The land in possession of the Hudson's Bay Company at the date of said act, and to which said company had a legal possessory right for a definite period, was not granted by said act, although priests of the Roman Catholic Church, by permission of said company, then had and maintained a missionary station thereon.

*(Syllabus by the Court.)*

In Equity.
*Whalley, Bronaugh & Northrup*, for plaintiff.
*P. H. Winston*, U. S. Atty., *P. C. Sullivan*, Asst. U. S. Atty., and *W. H. White*, for defendants and intervenor.

HANFORD, J. The plaintiff, in behalf of the Roman Catholic Church, which he represents, seeks, by this suit, primarily, to try the title to a tract of 430 acres of land in possession of the United States government, and occupied as a military reservation at Vancouver, in this state, and to obtain a declaratory judgment in his favor as the equitable owner, in trust for the church, of said property; and, incidentally, to obtain an injunction to prevent the commission of waste upon the premises. I wish to have it understood that in considering the merits of the plaintiff's claim I have not overlooked the very important question as to the power of the court in this suit to grant any part of the relief prayed for.

In the case of *U. S.* v. *Jones*, 131 U. S. 1, 9 Sup. Ct. Rep. 669, decided since this case was commenced, the supreme court held, in effect, that a person having an unquestionable right to a conveyance of title to land from the government, and wrongfully deprived of it, cannot maintain a suit to compel such a conveyance. I think that, under existing laws, a disputed claim of a mere right to have a conveyance of title from the United States cannot, consistently with that decision, be litigated in the courts in any form of proceeding. And, as this case does not come within any known exception to the general rule that an injunction to restrain waste by a party in possession, and claiming title adversely to the plaintiff, will not be granted, if it had been submitted to me on a demurrer to the complaint, I should probably have held that the plaintiff could not obtain either form of relief. A preliminary question as to the legal capacity of the plaintiff to maintain the suit has also been raised by counsel; but, as much time and labor has been spent in taking testimony, and in the argument on the merits, I have determined to pass by these questions and rest my decision on the facts and the law affecting the validity of the claim of the Catholic Church to this land. I do so in order that on appeal the whole case can be at once taken to the supreme court.

The land claimed by plaintiff was, with other land adjoining and surrounding it, occupied by the Hudson's Bay Company as a site for a fort, trading post, and farm, and was the metropolitan establishment of that company on the Pacific coast from about the year 1825 until it was occupied by United States troops in May, 1849. In so occupying the land, and in carrying on its trading business, the company was operating under a charter and license from the sovereign of England. The license to trade with the Indians west of the Rocky mountains, including the right to occupy said premises, was granted to the company in 1838, and was for a definite period of 21 years, and expired May 30, 1859. In the year 1838, two priests of the Roman Catholic Church came to Vancouver, under commission from the bishop of Quebec, to perform the duties of priests generally, and to serve as missionaries among the Indian inhabitants of the region. Their superior, the bishop of Quebec, instructed them to establish their principal residence at some point on the Cowlitz river, and they did so, taking possession of land for the purpose which was theretofore unoccupied, except by the Indians. They also established a missionary station upon unoccupied land at a place now known as "St. Paul," in the Willamette valley. At Vancouver they also established a missionary station, with the consent of the Hudson's Bay Company, upon the land now claimed, which, as before stated, was then occupied by that company, and maintained a station there continuously until and subsequent to August 14, 1848. During these years the first two who came were reinforced by other priests, and, except during one or two short intervals, one of the priests resided at Vancouver, and there held religious services, and administered the sacraments, according to the rites of his church, among such of the officers and servants of the company as were of the Catholic faith, and their families, and such

Indians as were sojourning there or came for religious instruction. In consideration of the services of the priests among its servants and their families, the Hudson's Bay Company contributed a regular stipend of $500 per annum for support of the mission, and furnished the resident priest a house to live in, and board or rations, and also provided a building for use as a chapel. In the treaty of 1846 between the United States and Great Britain, the Hudson's Bay Company's possessory right to the land for the unexpired part of said period of 21 years was recognized and guarantied by the following clause in the third article:

"In the future appropriation of the territory south of the forty-ninth parallel of north latitude, as provided in the first article of this treaty, the possessory rights of the Hudson's Bay Company, and of all British subjects who may be already in the occupation of the land, or other property lawfully acquired within the said territory, shall be respected."

The law upon which the plaintiff's claim to the land is founded is contained in a proviso to the first section of the organic act of Oregon territory, entitled "An act to establish the territorial government of Oregon," approved August 14, 1848, (9 U. S. St. 323,) and reads as follows:

"That the title to the land, not exceeding 640 acres, now occupied as missionary stations among the Indian tribes in said territory, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations respectively belong."

In May, 1849, Maj. Hathaway, of the United States army, with a company of soldiers, arrived at Vancouver, and he at once rented buildings for quarters from the Hudson's Bay Company, including part of the building used as the Catholic church, and, with the consent of said company, established a military camp upon the land now in dispute. A camp and garrison for the United States troops has been continously, from that time to the present, maintained there, and, except a small portion thereof, all of said land has been occupied and used for that purpose. In October, 1850, Col. Loring, U. S. A., the commanding officer of the United States troops at Vancouver, issued a proclamation creating a military reservation for use of the government of the United States, four miles square, with defined boundaries, including this land now claimed by the Catholic Church, and declaring said reservation to be subject only to the temporary possessory rights of the Hudson's Bay Company, guarantied by treaty; and also giving public notice that all improvements within the limits of the reservation would be appraised, and payment therefor recommended. May 16, 1853, the Catholic Church, for the first time, asserted its claim to this land by filing a notice thereof with the surveyor general of Oregon territory, in which notice the boundaries of the 640 acres claimed were attempted to be defined. On the 28th day of the same month, and again on December 31, 1853, amended notices were filed for the purpose of changing the boundaries. December 8, 1854, the commanding officer at Vancouver, Col. Bonneville, pursuant to instructions from the secretary of war, and in conformity to an act of congress, approved February 14, 1853, limiting the extent of military reservations to 640 acres, by a general order reduced the

reservation to that extent, and caused the same to be surveyed and the new boundaries to be marked; and about the same time caused the buildings, and the improvements on the reservation, including the Catholic church, to be appraised by a board of military officers. After the extinguishment of the Hudson's Bay Company's possessory right to the land, by limitation of time, in 1859, upon application made in behalf of the Catholic Church, the commissioner of the general land-office directed the surveyor general of Washington territory to survey the land claimed as a missionary station. Thereupon protests against the allowance of the mission claim, and divers adverse claims to the same land, were filed, and the commissioner of the general land-office then ordered the surveyor general to investigate the matter fully, and make a special report, which was done, that officer assuming the power to adjudicate and determine the questions, both of fact and law, involved; and he decided in favor of the validity of the mission claim. This decision was reversed by the commissioner of the general land-office. An appeal was then taken to the secretary of the interior, and the final decision of the matter in the department of the interior was rendered by the secretary, March 11, 1872, allowing the claim, and authorizing the issuance of a patent for a small piece of land, less than half an acre in extent, upon which the building used as a church was situated, and rejecting it as to every other part of the land claimed. On the 15th of January, 1878, the president approved a final survey and plat of the military reservation, and confirmed the previous action of the war department, and declared said reservation to be duly set apart for military purposes. The government has purchased from the Hudson's Bay Company, and paid it for all the buildings and improvements of a permanent character which said company erected or made upon the land, including the Catholic church. And, prior to the commencement of this suit, everything necessary to constitute this land a government reserve for military purposes was formally and completely done.

In the argument counsel for the plaintiff has insisted that the decision of the secretary of the interior is conclusive as to the facts in the case. I think, however, that, as congress has not conferred any authority upon the department to take proofs or decide any question concerning the grants made for missionary stations by the statute above cited, the court is not bound by said decision, and it must find the facts, in an independent way, from the testimony given upon the trial and the exhibits introduced.

It is assumed in the brief and argument of counsel for the plaintiff that the question of chief importance in the case is whether there was a missionary station upon this land on the 14th day of August, 1848. And the contention is that if a missionary station existed there on that day, then, by the said act of congress, a right to the full quantity of 640 acres passed to and became vested in the religious society which the plaintiff represents, subject only to the incumbrance of the Hudson's Bay Company's temporary right of possession. This assumption is based upon the supposition that congress intended by this act to make

a grant of part of the public domain as a mere gift or contribution from the nation to the cause of religion; or, if not as a gift purely, then, as a grant in consideration of the good done by missionaries among the Indian tribes of Oregon.    I am convinced, however, that the purpose of the act was not to make a gift, nor to reward meritorious efforts in the missionary service, but rather to recognize the just claims of a few people, who had incidentally, in connection with missionary labor, by their toil created property, whereby the material interests of the nation were affected and greatly benefited, and to protect their natural rights to the property so created by confirming to them the legal title thereto.    It is to be presumed that in legislating for Oregon, congress was influenced by existing facts which were then generally well known.    It was a fact well known, at the time of the passage of this statute, that missionary stations had been established and were then maintained among the Indian tribes at several places in Oregon territory by different denominations of Christians; that said missionary stations occupied land upon which they had erected dwelling-houses, school-houses, churches, barns, and mills, and, in connection therewith, gardens and fields were cultivated, all of which were necessary to the success of the missions, and for the support and comfort of the missionaries and their families.    The missionaries were mostly loyal citizens of the United States; they were the pioneers of immigration; they aided in establishing the provisional government of Oregon; and they were helpers in securing this country for this nation. Failure or neglect on the part of the government to make good the titles of the first American inhabitants of the country to the land, made valuable by their labor, would have been base ingratitude.    To do what congress did—that is, confirm to the several societies the titles to the land occupied by their respective missionary stations, with the improvements thereon made by their servants, the missionaries—was simply justice.    In this view of the matter the appropriateness of the somewhat peculiar phraseology of the statute becomes apparent.    The form of conveying title by confirming instead of granting the same harmonizes with the idea of a pre-existing equitable right, and an already acquired possession; the word "occupied"—a synonym for possessed, covered, filled —is an appropriate word to use for the purpose of identifying land in actual possession and use.    The seemingly vague and loose expression, "religious societies," applicable as well to Jewish, Mormon, or Buddhist as to Christian organizations, which in the act serves to designate the grantees, can be very well understood, and becomes definite, when it is considered that at that time the missionary stations were prominent points in Oregon territory.    Their existence and occupancy of land was so well known that the taking of proof to establish these facts must have been regarded by congress as a work of supererogation.    The entire frame of the act clearly indicates that congress intended to grant specific lands to certain well-known institutions.    These considerations make it necessary to give the word "occupied" its full force and meaning, and excludes the idea that the occupancy of a tenant or guest, or any occupancy in subserviency to the right of another, could suffice to support a claim

to a grant under this statute. 'As the Catholic missionaries did not improve the land claimed in this suit, nor occupy it, except by permission from and in subordination to the Hudson's Bay Company, it is impossible for me to conclude that congress intended to or did give the valuable buildings and improvements on this land which that company owned to the church, a conclusion not to be escaped from if the land covered by those improvements was granted. The supreme court of the United States, in the case of *Society* v. *Dalles*, 107 U. S. 336, 2 Sup. Ct. Rep. 672, construed this act as a grant of only the land actually occupied as a missionary station among the Indian tribes. Another view that may be taken of the case is this: If the act is not to be regarded as a grant of specific land, capable of being identified by the description given in the act, then it must be a floating grant, and a grantee under it could acquire no vested right to any particular tract until a selection had been made, and the boundaries of the granted premises ascertained and established. No steps tending towards this end were taken until after the land now claimed had been appropriated and duly set apart for governmental use. It was then too late. The rights of the United States to this land as a military reservation are older, and for that reason, if for no other, superior in equity to the claim of the plaintiff. Findings may be prepared in accordance with this opinion, and a decree will be entered in favor of the defendants.