## ROBERTS *v.* BRADFIELD.

EQUITY PRACTICE; PARTIES, NONJOINDER OF; CONSTITUTIONAL
LAW; CONTRACTS; SECTARIAN INSTITUTIONS.

1. To a suit in equity to enjoin the Treasurer of the United States from paying out any moneys of the United States or the District of Columbia to a private charitable organization, under a contract between the Commissioners of the District of Columbia and such corporation, the Commissioners and the corporation are necessary parties.

2. The nonjoinder of such parties in such a suit, is a sufficient justification for the reversal of a decree of the lower court sustaining a demurrer to the bill of complaint therein and granting the injunction prayed for, although the defect is first urged in the appeal.

3. A bill in equity is maintainable in the District by a resident tax-payer on behalf of himself and other taxpayers, to prevent an illegal disposition of public moneys by the District authorities.

4. A contract between the Commissioners of this District and a private charitable organization, incorporated as a hospital by act of Congress, and under sectarian control, whereby the Commissioners agree to erect an isolated building or ward upon the hospital property, a portion of which building or ward is to be reserved for poor patients suffering with contagious diseases, for whose treatment and accommodation the Commissioners are to pay a given sum from appropriations made by Congress in the act of March 3, 1897, providing for the erection of such a building, does not violate the provision of the First Amendment of the Constitution of the United States, prohibiting the passage of laws "respecting an establishment of religion," and a bill in equity by a resident tax-payer will not lie to enjoin the District authorities from paying public moneys to the corporation under the terms of such a contract.

5. The provisions of the act of Congress of March 3, 1897, making appropriations for the expenses of the District of Columbia for the fiscal year ending June 30, 1898, declaring it to be the policy of the Government of the United States to make no appropriations for sectarian purposes, and enacting that after June 30, 1898, no money appropriated for charitable purposes in the District shall be paid to any church or religious denomination or to any institution or society which is under sectarian control, does not control the discretion of the District Commissioners in the matter of the making of such a contract and does not render it invalid.

No. 782. Submitted March 8, 1898. Decided April 4, 1898.

HEARING on an appeal by the defendant from a decree overruling a demurrer to and granting the prayers of a bill to enjoin the Treasurer of the United States from paying any money to a hospital under a contract between it and the Commissioners of the District of Columbia. *Reversed.*

The COURT in its opinion stated the case as follows:

There is an appeal by Ellis H. Roberts, the Treasurer of the United States, from a decree enjoining him from paying any money of the United States or the District of Columbia to the Providence Hospital under a contract made therewith by the Commissioners of the District of Columbia.

The bill was filed by Joseph Bradfield, a citizen of the United States and a resident of the District of Columbia, "in the interest of himself and all other citizens of the United States similarly situated."

The contract, payments under which are sought to be enjoined, is made an exhibit to the bill, and reads as follows :

Articles of agreement entered into this sixteenth day of August, in the year of our Lord, one thousand eight hundred and ninety-seven, by and between the Commissioners of the District of Columbia and the directors of Providence hospital, a body corporate in said District, whereby it° is agreed on the part of the Commissioners of the District of Columbia—

That they will erect on the grounds of said hospital an isolating building or ward for the treatment of minor contagious diseases, said building or ward to be erected without expense to said hospital, except such as it may elect, but to be paid out of an appropriation for that purpose contained in the District appropriation bill, approved March 3, 1897, on plans to be furnished by the said Commissioners, and approved by the health officer of the District of Columbia, and that when the said building or ward is fully completed, it shall be turned over to the officers of Providence hospital, subject to the following provisions:

First. That two-thirds of the entire capacity of said isolating building or ward shall be reserved for the use of such poor patients as shall be sent there by the Commissioners of the District from time to time through the proper officers. For each such patient, said Commissioners and their successors in office are to pay at the rate of two hundred and fifty dollars ($250) per annum, for such a time as such patient may be in the hospital, subject to annual appropriations by Congress.

Second. That persons able to pay for treatment may make such arrangements for entering the said building or ward as shall be determined by those in charge thereof, and such

persons will pay to said Providence hospital reasonable
compensation for such treatment, to be fixed by the hospital
authorities, but such persons shall have the privilege of
selecting their own physicians and nurses, and in case phy-
sicians and nurses are selected other than those assigned by
the hospital, it shall be at the expense of the patient making
the request.

And said Providence hospital agrees to always maintain
a neutral zone of forty (40) feet around said isolating build-
ing or ward and grounds connected therewith to which
patients of said ward have access.

As witness the signatures and seals of John W. Ross, John
B. Wight, and Edward Burr, acting, Commissioners of the
District of Columbia, and the corporate seal of the said The
Directors of Providence Hospital and the signature of presi-
dent thereof, this sixteenth day of August, A. D. 1897.

> (Signed)    JOHN W. ROSS,        [SEAL.]
> (Signed)    JOHN B. WIGHT,       [SEAL.]
> (Signed)    EDW. BURR, *Acting*,  [SEAL.]
> *Commissioners of the District of Columbia.*

Witness as to the Commissioners :
   WILLIAM TINDALL.

> .(Signed)    SISTER BÉATRICE,      [SEAL.]
> *President Providence Hospital.*

Witness as to Sister Beatrice :
   W. C. WOODWARD.

Having set out the contract, the grounds of the relief
prayed for are thus alleged in the bill :

"4. That the said Providence hospital is a private elee-
mosynary corporation, and that to the best of complainant's
knowledge and belief it is composed of members of a
monastic order or sisterhood of the Roman Catholic Church
and is conducted under the auspices of said church ; that
the title to its property is vested in the 'Sisters of Charity

of Emmettsburg, Maryland;' that it was incorporated by a special act of Congress approved April 8, 1864, whereby, in addition to the usual powers of bodies corporate and politic, it was invested specially with 'full power and all the rights of opening and keeping a hospital in the city of Washington for the care of such sick and invalid persons as may place themselves under the treatment and care of said corporation.

"5. That in view of the sectarian character of said Providence hospital and the specific and limited object of its creation, the said contract between the same and the Surgeon General of the Army and also the said agreement between the same and the Commissioners of the District of Columbia are unauthorized by law and, moreover, involve a principle and a precedent for the appropriation of the funds of the United States for the use and support of religious societies contrary to the article of the Constitution which declares that Congress shall make no law respecting a religious establishment, and also a precedent for giving to religious societies a legal agency in carrying into effect a public and civil duty which would, if once established, speedily obliterate the essential distinction between civil and religious functions.

"6. That the complainant and all other citizens and taxpayers of the United States are injured by reason of the said contract and the said agreement, in virtue whereof the public funds are being used and pledged for the advancement and support of a private and sectarian corporation, and that they will suffer irreparable damage if the same are allowed to be carried into effect by means of payments made through or by the said defendant out of the Treasury of the United States, contrary to the Constitution and declared policy of the Government."

The defendant demurred generally to the bill, and the case was submitted thereon, resulting in the grant of the injunction as prayed.

*Mr. Henry E. Davis*, U. S. Attorney for the District of Columbia, and *Mr. Daniel W. Baker*, Assistant Attorney, for the appellant.

*Mr. Joseph Bradfield, p. p.*, and *Mr. J. A. D. Richards* and *Mr. L. A. Bailey* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The record does not show that objection was made to the bill for want of necessary parties defendant; and neither that question, nor the right of the complainant to maintain the suit as a taxpayer of the District of Columbia, are noticed in the opinion of the learned justice who presided below.

The Treasurer of the United States, who alone was made a party, has no interest whatever in the controversy.

He is an officer of the United States, having custody, among other money, of that raised by taxation in the District of Columbia, and is charged with the ministerial duty of paying out the same upon claims and requisitions duly certified to him by the proper officers under the necessary appropriations made by Congress.

It is under this view of his duty in the premises, alone, that his action in any matter could be compelled by *mandamus* or restrained by injunction. *Noble* v. *Union River Logging R.*, 147 U. S. 165, 172.

The persons directly interested in defending this suit are the parties to the contract which the plaintiff seeks to annul. They are the Commissioners of the District, on the one hand, who have acted in the performance of a duty imposed by law; and the Providence Hospital, on the other, which has promised a consideration valuable in law.

Had objection been made on account of their nonjoinder the trial court would, no doubt, have ordered the plaintiff to make them parties defendant, under the penalty of dismissal of his bill.

The defect being palpable and having been pressed upon

our attention on the argument, we have no doubt of our power—indeed, it is questionable if it is not our duty—to reverse the decree because of the omission of the plaintiff to bring into the controversy the parties aforesaid who are directly and substantially interested in the result. *California* v. *Southern Pacific Co.*, 157 U. S. 229, 255; *N. O. Water Works Co.* v. *New Orleans*, 164 U. S. 471, 480.

In view, however, of the failure to call attention to this defect of parties on the hearing below, and of our opinion that the bill should have been dismissed for want of merit, we have concluded to treat the case as if all the interested parties were sufficiently represented by the appellant, and thus speed the final settlement of the question, which is one affecting important public interests.

2. The right of a court of equity to take jurisdiction over the case made by the bill was necessarily raised by the demurrer. In making the contract that is the occasion of the controversy, the District Commissioners acted as the governing officers and representatives of the District of Columbia in its capacity of a municipal corporation. Had it and its representatives been made parties to the bill as the real defendants against whom relief is sought, the question would have been freed from much doubt. In a case in the Supreme Court of the United States, where similar relief was asked against the unlawful acts of the authorities of a municipal corporation of the State of New Jersey it was said by Mr. Justice Field, who delivered the opinion of the court, that:

"Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the·moneys of the county or the illegal creation of a debt which they, in common with other property holders of the county, may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the State courts in numerous cases; and from the nature of the powers exercised by municipal corporations

the great danger of their abuse and the necessity of prompt. action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere upon the application of the taxpayers of a county to prevent the consummation of a wrong, when the officers of these corporations assume, in excess of their powers, to create burdens upon property holders. Certainly, in the absence of legislation restricting the right to interfere in such cases to public officers of the State or county, there would seem to be no substantial reason why a bill by or on behalf of individual taxpayers should not be entertained to prevent the misuse of corporate powers. The courts may be safely intrusted to prevent the abuse of their process in such cases." *Crampton* v. *Zabriskie*, 101 U. S. 601, 609; see, also, *Brown* v. *Trousdale*, 138 U. S. 389, 394; *Colvin* v. *Jacksonville*, 158 U. S. 456; *Ogden City* v. *Armstrong*, 168 U. S. 224, 236.

Having declined to dismiss the bill for the failure to make the District of Columbia, or the Commissioners thereof, parties defendant, we are constrained to regard the bill, in passing on the point, as if in reality directed against the District of Columbia to prevent a damage irremediable at law. In other words, accepting the sufficiency of the allegation of irreparable damage, which is admitted by the demurrer, we will regard the bill as directed against Ellis H. Roberts, not as the Treasurer and representative of the United States, but as, *ex officio*, the representative treasurer, so to speak, of the District of Columbia, and as such charged by law with the duty of paying out the money thereof under the contract made with its representatives.

3. The authority for the contract in this case is found in the general appropriation act for the expenses of the District of Columbia, approved March 3, 1897. Under the general head of "Health Department" is found the following clause: "For two isolating buildings, to be constructed, in the discretion of the Commissioners of the District of Columbia, on the grounds of two hospitals and to be operated as a

part of such hospitals, thirty thousand dollars." 29 Stat. 679.

It is a matter of common knowledge that there is no hospital in the District for the isolation and proper care of persons suffering from even the "minor contagious diseases," so called in the contract aforesaid; and that all attempts heretofore made to meet the imperative demand therefor, through the erection of a suitable building by the District itself, have been thwarted by the opposition of residents and property owners who feared injury to person and property from its location in their neighborhood.

This accounts for the aforesaid clause of the act and the discretion thereby conferred upon the Commissioners. In the exercise of that discretion they made the contract with the Providence Hospital.

As we have seen in the statement of the case, the complainant's bill alleges: "That the said Providence Hospital is a private eleemosynary corporation, and that to the best of complainant's knowledge and belief, it is composed of members of a monastic order or sisterhood of the Roman Catholic Church and is conducted under the auspices of said church; that the title to its property is vested in the Sisters of Charity of Emmettsburg, Maryland; that it was incorporated by a special act of Congress, approved April 8, 1864."

The aforesaid act of incorporation is a public act, and for a complete understanding of the case is here given in full:

"Chap. 1. An act to incorporate Providence Hospital of the City of Washington, District of Columbia.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That Lucy Gwynn, Teresa Angela Costello, Sarah McDonald, Mary E. Spalding and Mary Carroll, and their successors in office, are hereby made, declared and constituted a corporation and body politic, in law and in fact, under the name and style of the directors of Providence Hospital, and by that name they shall be and are hereby

made capable in law to sue and be sued, to plead and be impleaded, in any court within the County of Washington, in the District of Columbia; to have and use a common seal, and to alter or amend the same at pleasure; to have, purchase, receive, possess and enjoy any estate in lands, tenements, annuities, goods, chattels, moneys or effects, and to grant, devise or dispose of the same in such manner as they may deem most for the interest of the hospital; Provided, That the real estate held by said corporation shall not exceed in value the sum of one hundred and fifty thousand dollars.

"Sec. 2. And be it further enacted, That the said corporation and body politic shall have full power to appoint from their own body a president and such other officers as they may deem necessary for the purposes of their creation; and in case of the death, resignation or refusal to serve of any of their number, the remaining members shall elect and appoint other persons in lieu of those whose places may have been vacated; and the said corporation shall have full power and all the rights of opening and keeping a hospital in the city of Washington for the care of such sick and invalid persons as may place themselves under the treatment and care of the said corporation.

"Sec. 3. And be it further enacted, that the said corporation shall also have and enjoy full power and authority to make such by-laws, rules, and regulations, as may be necessary for the general accomplishment of the objects of said hospital: Provided, that they be not inconsistent with the laws in force in the District of Columbia: And provided, further, that this act shall be liable to be amended, altered, or repealed at the pleasure of Congress." Approved April 8, 1864; 13 Stat. 43.

Founded on the allegations aforesaid, the contention is that the provision of the law, as given effect by the Commissioners in contracting to pay money thereby appropriated to the above named corporation, is in violation of that part

of the First Amendment of the Constitution which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

We do not understand it to be denied that Congress, in legislating for the District of Columbia, possesses the combined powers of the general government and that of a State; nor that appropriations of money for the necessary care of the public health and the maintenance of proper public charities are within those powers.

It seems to have been the practice of Congress for many years to provide, in part at least, for the care of the sick, and other objects of charity, through appropriations of money to private institutions and associations, in consideration of actual services in these regards, or upon special contracts therefor.

This practice seems, also, to have prevailed unquestioned in respect of the power, though not always as regards its policy or expediency. And we do not understand the complainant as denying the power to authorize contracts of this nature made with private persons, or with associations of persons, not sectarian, or under the control of an organized church. It is expressly admitted in the opinion of the learned justice who rendered the decree appealed from.

He found nothing on the face of the provision of the appropriation act in conflict with the Constitution; but based his objection entirely upon the manner in which the Commissioners exercised the power conferred through the contract made with Providence Hospital, by reason of the character of its alleged ownership and control.

The contention, then, goes no further than that, under the conditions mentioned, which are alleged to prevail in the case of Providence Hospital, the contract for the payment of money, for services rendered, becomes a grant by law in aid of an establishment of religion, and is therefore within the prohibition of the First Amendment.

Conceding the power of Congress to appropriate money for a given purpose, and to contract for the execution of that purpose with a natural person, or an association of persons, not subject to the authority and control of an organized church, it is clear that no court would undertake, in such case, to inquire into the religious beliefs of the single individual, or of the natural persons composing the association or corporation; for such an inquiry, or a law requiring it, would be an interference with the free exercise of religion.

As shown in the incorporation act above set forth, Providence Hospital is a formal, private corporation, of unlimited duration, subject only to the power of Congress to amend and repeal. Its incorporators are natural persons, whose remaining members are vested with the power to fill vacancies as they shall occur. Power is conferred to establish and conduct a hospital, to have a corporate seal, to contract and to sue and be sued in its corporate name, and to receive and hold real estate and other property for the purposes of its creation.

It is not declared the trustee of any church or religious society. Its property is to be acquired in its own name and for its own purposes. That property and its business are to be managed in its own way, subject to no visitation, supervision or control by an ecclesiastical authority whatever, but only to that of the Government which created it. In respect, then, of its creation, organization, management and ownership of property, it is an ordinary private corporation, whose rights are determinable by the law of the land, and the religious opinions of whose members are not subjects of inquiry. *Watson* v. *Jones,* 13 Wall. 679, 724, 725; *Robertson* v. *Bullions,* 11 N. Y. 243, 251; *Keyser* v. *Stansifer,* 6 Ohio, 363; *Warner* v. *Bowdoin Square Bap. Ch.,* 148 Mass. 400, 404.

Notwithstanding other inconsistent allegations of the complainant's belief in respect of the real ownership and

control of Providence Hospital, this case, in accordance with the foregoing views, might be ended here in a reversal of the decree. But, construing the bill most favorably to the complainant, and assuming it to be true, as he alleges he believes it to be, that the corporation called Providence Hospital is "composed of members of a monastic order or sisterhood of the Roman Catholic Church, and is conducted under the auspices of said church; that the title to its property is vested in the Sisters of Charity of Emmettsburg, Maryland," and that it is in fact a "religious establishment," we are, nevertheless, of the opinion that the injunction can not be be sustained.

The authorities relied upon as directly supporting the opposite view are two messages of President Madison to the Congress of the United States. In the first of these, February 21, 1811, he vetoed an "Act incorporating the Protestant Episcopal Church in the town of Alexandria, in the District of Columbia."

The reasons given for refusing to approve the act are thus stated: "The bill exceeds the rightful authority to which governments are limited by the esssential distinctions between civil and religious functions, and violates in particular the article of the Constitution of the United States which declares that 'Congress shall make no law respecting a religious establishment.' . . . This particular church, therefore, would so far be a religious establishment by law, a legal force and sanction being given to certain articles in its constitution and administration." The concluding paragraph of this message touches the very question presented here, upon the assumption that Providence Hospital is a religious establishment: "Because the bill vests in the said incorporated church an authority to provide for the support of the poor and the education of poor children of the same, an authority which, being altogether superfluous if the provision is to be the result of pious charity, would be a precedent for giving to religious societies, as such, a legal agency

in carrying into effect a public and civil duty." Messages of the Presidents, Richardson, Vol. 1, 489, 490.

A few days later he vetoed an act for the relief of certain persons "and the Baptist Church at Salem Meeting House, in the Mississippi Territory;" "Because the bill in reserving a certain parcel of land of the United States for the use of said Baptist church comprises a principle and precedent for the appropriation of funds of the United States for the use and support of religious societies, contrary to the article of the Constitution which declares that 'Congress shall make no law respecting a religious establishment.'" *Idem*, 490.

This second veto message is based on an objection, namely, a gift of lands to a religious establishment, that does not exist in this case at all, and therefore is not relevant to the question as presented here.

It seems strange, however, that, in both messages, President Madison should have made the mistake of quoting the words of the amendment as prohibiting laws "respecting a religious establishment" instead of "respecting an establishment of religion."

In the light of previous English and colonial history, and of the circumstances which led directly to the adoption of the amendment, we venture to suggest that "establishment of religion," as used therein, can hardly be regarded as altogether synonymous with "religious establishment."

The history of the origin of the First Amendment is given by Chief Justice Waite, in the case of *Reynolds* v. *United States*, 98 U. S. 145, 162, 164. He quotes from a letter of Mr. Jefferson, written just after its adoption, as follows:

"Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the Government reach actions only and not opinions—I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of

religion or prohibiting the free exercise thereof,' thus building a wall of separation between Church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore man to all his natural rights, convinced he has no natural right in opposition to his social duties." The Chief Justice then adds: "Coming as this does from an acknowledged leader of the advocates of the measure, it may be accepted almost as an authoritative declaration of the scope and effect of the amendment thus secured."

Without assuming to express an opinion of the real scope of the prohibitory words, we suggest that it seems to be the opinion of learned commentators of very high authority, that the declaration was intended to secure nothing more than complete religious liberty to all persons, and the absolute separation of the Church from the State, by the prohibition of any preference, by law, in favor of any one religious persuasion or mode of worship. Cooley, Const. Lim. (6th Ed.) 575; 2 Story Const., Sec. 1871 *et seq.*; 2 Kent's Com. 34, 35; Rawle Constitution, 121 *et seq.*; see, also, *Trustees First Meth. Ep. Ch.* v. *City of Atlanta,* 76 Ga. 181, 196.

Within four years after the messages aforesaid, vetoing the act incorporating the Protestant Episcopal Church of Alexandria (then in the District of Columbia), a case came before the Supreme Court of the United States, wherein the members of the vestry of the same church sued the overseers of the poor to quiet the title to certain land belonging to the church, which the defendants claimed under certain forfeiture acts of the legislature of Virginia. *Terrett* v. *Taylor,* 9 Cranch, 43, 47, 49, 51. The legal establishment of the Episcopal Church in Virginia ended with the Revolution; but a statute of 1776 confirmed and established its rights to its lands and other property.

The act of 1784, chapter 88, made the vestry of each parish a corporation with perpetual succession. This was repealed

in 1786, chapter 12, but with a proviso saving the church property and authorizing the trustees to preserve it for the church uses. These property rights were further confirmed by act of 1788, chapter 47. The foregoing statutes were all repealed by act of 1798, chapter 9, "as inconsistent with the principles of the Constitution and of religious freedom." By act of 1801, chapter 5, the property of the church was declared to be in the State, and vacant glebe lands were required to be sold by the overseers for the benefit of the poor of the parish. (This act was passed after the cession of the territory, comprising Alexandria, to the United States as a part of the District of Columbia.)

The court held that the lands of the established church did not become the property of the State at the Revolution; that it was competent for the legislature to incorporate the church and confirm its title; and that this legislative grant was irrevocable.

Mr. Justice Story, who delivered the opinion of the court, said in discussing the incorporating act of 1776 : "It is conceded on all sides that at the Revolution the Episcopal Church no longer retained its character as an exclusive religious establishment. And there can be no doubt that it was competent to the people and to the legislature to deprive it of its superiority over other religious sects, and to withhold from it any support by public taxation. But, although it may be true that 'religion can be directed only by reason and conviction, not by force or violence,' and that 'all men are equally entitled to the free exercise of religion according to the dictates of conscience,' as the bill of rights of Virginia declares, yet it is difficult to perceive how it follows, as a consequence, that the legislature may not enact laws more effectually to enable all sects to accomplish the great objects of religion by giving them corporate rights for the management of their property, and the regulation of their temporal as well as spiritual concerns. Consistent with the Constitution of Virginia the legislature could not create or continue

a religious establishment which should have exclusive rights and prerogatives, or compel the citizens to worship under a stipulated form or discipline, or to pay taxes to those whose creed they could not conscientiously believe. But the free exercise of religion can not be justly deemed to be restrained by aiding with equal attention the votaries of every sect to perform their own religious duties, or by establishing funds for the support of ministers, for public charities, for the endowment of churches, or for the sepulture of the dead. And that these purposes could be better secured and cherished by corporate powers can not be doubted by any person who has attended to the difficulties which surround all voluntary associations."

Again, referring to the incorporation act of 1766, he said: "It is asserted by the Legislature of Virginia, in 1798 and 1801, that this statute was inconsistent with the bill of rights and Constitution of that State, and therefore void. Whatever weight such a declaration might properly have as the opinion of wise and learned men, as a declaration of what the law has been or is, it can have no decisive authority. It is, however, encountered by the opinion successively given by former legislatures from the earliest existence of the Constitution itself, which were composed of men of the very first rank for talents and learning. And this opinion, too, is not only a contemporaneous exposition of the Constitution, but has the additional weight that it was promulgated or acquiesced in by a great majority, if not the whole, of the framers of the Constitution."

Notwithstanding the views expressed by President Madison, and which were sustained by Congress in acting upon his messages, subsequent Congresses continued to incorporate in the District of Columbia charitable, educational and religious societies, some of which were under the control of different churches. In 1832 an act was passed and approved giving Columbian College lands of the value of $25,000; and in 1833 a similar grant was made to Georgetown Col-

lege. 4 Stat. 603; 6 Stat. 538. Both were then notoriously under church auspices: the former Baptist; the latter Roman Catholic. (For a statement of donations that have been made by Congress to charitable institutions under the direct control of different churches, see report of joint select committee to investigate the charities and reformatory institutions in the District of Columbia, made March 21, 1898.)

May 5, 1870, the general incorporation act of the District of Columbia was approved, and the second class of corporations authorized to be formed are "Religious Societies," to the government of which eleven sections are devoted. R. S. D. C., Sec. 533 *et seq.* The validity of the incorporation of a church under this act was affirmed in the Supreme Court of the United States, though the question of the constitutionality of the statute itself was not raised or noticed. *B. & P. R. Co.* v. *Fifth Baptist Church*, 137 U. S. 568.

In the act of 1848, establishing the territorial government of Oregon, Congress expressly exercised the power denied by President Madison in the second message hereinabove referred to. A provision of this act granted the title to not more than 640 acres of land then occupied as missionary stations among the Indians in that territory, to "the several religious societies to which said missionary stations respectively belong." 9 Stat. 323. The power of Congress to make this donation to religious establishments passed unquestioned in two cases in the Supreme Court of the United States, wherein the priority of titles claimed thereunder was the subject of controversy. *Missionary Society (Methodist Episcopal)* v. *Dalles*, 107 U. S. 336, 339; *Catholic Bishop of Nesqually* v. *Gibbon*, 158 U. S. 155, 171. Referring to the character of the grant in this last case, Mr. Justice Brewer said: "That this was a donation instead of a grant of the right to purchase, is immaterial. The donation feature was inserted because of the benefits supposed to flow from the religious work of the mission, and proceeded

upon the same principle that exempts from taxation the property of religious organizations."

In this connection, also, it may not be irrelevant to remark the uniform practice of Congress to provide chaplains for each House, at public expense, as well as chaplains in the army and navy.

The principle conserved by the First Amendment is found, in one form or another, in the Constitutions of the States of the Union; and yet the practice has been common in them all—unquestioned, so far as we are advised—to admit religious establishments and societies for religious purposes, to incorporation both by special law and under general incorporation acts.

Considering the general terms of the Amendment, the common practice of Congress and State legislatures for so many years, and the judicial decisions above cited, we could not, if the case turned upon the particular question, justify ourselves in holding that Congress has not the power to incorporate, within the District of Columbia, a religious establishment or an association or society under the express control of a church or sect.

If, then, such a corporation may be lawfully created, why may not Providence Hospital, though, as alleged, owned and conducted by "a monastic order or sisterhood of the Roman Catholic Church," contract with the duly authorized agents of the Government to receive, not a subsidy or a gift of money, but compensation for actual services to be rendered?

If the United States were engaged in war, would they be denied the power, no matter how advantageous or necessary it might be in some instances, to contract with religious societies or associations for hospital supplies, or for nursing their sick and wounded soldiers in their own or in private hospitals?

If a church or religious establishment were the lowest bidder on a proposition by the United States for the lease

or sale of a building for any legitimate government use or purpose, would the power be denied to authorize the lease or purchase because of the character of the ownership of the offered property?

In our opinion a law authorizing a contract to be made without discrimination or preference, or a contract made under general discretion reposed in authorized agents, for the rendition of actual services in nursing the sick or preventing contagion, with a corporation that may be under the control of a church, can not be declared void as "a law" or an act authorized by law, "respecting an establishment of religion."

In Illinois, under a constitutional provision specially prohibiting appropriations of public money in aid of any church or sectarian institution whatsoever, it has been held that a school board could contract with a church for the lease of rooms in it to be occupied by a public school. *Millard* v. *Board of Education*, 121 Ill. 297.

As we have before remarked, all the States seem to have provisions in their constitutions of the same general purport as the First Amendment to the Federal Constitution, which have not been regarded as interfering with the incorporation of churches or sectarian establishments. But many of them, also, contain special prohibitions of donations or grants of public money in aid of such establishments. So far as we can ascertain, there have been but few decisions interpreting these special provisions, in application to facts having any similarity to those of this case.

Notwithstanding we may have already consumed more time than necessary in the discussion of this case, we will review the decisions referred to as briefly as possible.

(1) *County of Cook* v. *Industrial School for Girls,* 125 Ill. 540. This was an action of *assumpsit* to recover the value of the board, tuition and clothing of girls committed by order of court to the custody of the Industrial School. It appeared that the plaintiff was a corporation in name only,

and that whilst commitments were to it by the judgments of the proper courts, the girls were in fact delivered to two institutions owned and controlled by the Roman Catholic Church, called House of the Good Shepherd, and St. Joseph's Orphan School. The girls were divided between these two, and the charges for tuition and care were received by them. After holding that no services were performed by the plaintiff, the court discussed at length and denied the power of the legislature to appropriate money for services to be rendered by any church or sectarian denomination. Holding that the two schools aforesaid were sectarian, it was declared that the act under which the payment was claimed, entitled "An act to aid industrial schools for girls," was in violation of section 3, of article 8, of the Constitution of Illinois. The effect of that section is thus stated in the opinion of the court: "The second clause of section 3 provides, that no grant or *donation* of land, money or other personal property shall ever be made to any church or for any sectarian purpose by the State, that is, the General Assembly, or any such public corporation, that is, any county, city, town, township or school district, etc. The first clause says that neither the State nor any such public corporation shall ever make any appropriation, or pay from any public fund whatever, anything in aid of any church or sectarian purpose. Evidently the second clause was intended to prohibit something different from the first clause. The second prohibits grants and donations; the first, grants and appropriations 'in aid.' If the appropriations and payments mentioned in the first clause mean simply 'donations' and nothing more, then it was surplusage to add the second clause to the section. Upon the plainest principles of construction, the first clause has reference to a different kind of aid from that to be derived from donations. Its language is comprehensive enough to embrace all appropriations and payments, whether based on a consideration or not."

In the course of the opinion the decision in *Millard* v. *Board of Education*, 121 Ill. 297, cited above, is approved and its principle distinguished.

(2) *State of Nevada* v. *Hollock*, 16 Nev. 373.

In this case a *mandamus* was refused to compel the State Comptroller to audit·an account in favor of the Nevada Orphan Asylum (a sectarian asylum and school), under the provisions of "An act to appropriate funds for the *relief* of the several orphan asylums of this State, approved March 3, 1881." The act was held to, violate section 10 of the Constitution of Nevada as amended, which declares that "No public funds of any kind or character whatever, State, county or municipal, shall be used for sectarian purposes." The State had asylums, it appears, of its own; and the court said, referring to the title of the act as showing the intent: "It can not be doubted that the appropriation was intended to be a mere charity. . . . The seventy-five dollars appropriated for each orphan is a contribution only. Should it be given, it would be used for the relief and support of a sectarian institution, and in part, at least, for sectarian purposes. Should it be admitted that it would be used in part for legitimate purposes, still it is impossible to separate the legitimate use from that which is forbidden." The asylum was a school, and daily religious instruction was given, but not forced upon those of another faith. Daily religious services were held, which all were required to attend. Children of other beliefs were not compelled to join in the prayers, but were required to kneel in silence.

(3) *Synod of Dakota* v. *State of South Dakota*, 2 S. D. 366; S. C., 14 L. R. A. 418.

An act of the territorial legislature authorized payment to Pierre University—an institution under the control of the Presbyterian Church—for the education of a certain number of scholars each year. The constitution of the State, subsequently adopted, contained a section very much like that of Illinois on the same subject, with this additional clause:

"And no sectarian instruction shall be allowed in any school or institution aided or supported by the State." It was held that this section of the constitution abrogated the statute.

Bearing in mind the essential difference between the constitutional prohibition controlling the foregoing decisions, respectively, and that of the Federal Constitution, which governs here, we do not find any necessary antagonism between them and the conclusion at which we have arrived; on the contrary, inferences, logically deducible therefrom, would seem to support that conclusion.

In *State* v. *Hallock, supra,* the court, in giving the history of the amendment of the constitution, shows that it was the result of popular dissatisfaction with a general clause prohibiting sectarian instruction in schools maintained at public expense, and was apparently devised to meet the situation presented.

As we have seen, also, in the extract quoted above from the opinion in *Cook Co.* v. *Industrial School,* the court found that by reason of a special clause prohibiting appropriations in aid of any church or sectarian purpose, in addition to one prohibiting *donations* merely, the intention was to go farther and "embrace all appropriations or payments, whether based on a consideration or not."

4. Another point raised on the argument remains to be considered. Under the head of "Charities," in the same general appropriation act, large sums of money are set apart to many charitable institutions and societies, by name, that are under church supervision, control and ownership. The last item of such appropriations is followed by the following clause: "And it is hereby declared to be the policy of the Government of the United States to make no appropriation of money or property for the purpose of founding, maintaining or aiding, by payment for services, expenses or otherwise, any church or religious denomination or any institution or society which is under sectarian or ecclesiastical control; and it is hereby enacted that, from and after the thirtieth

day of June, 1898, no money appropriated for charitable purposes in the District of Columbia shall be paid to any church or religious denomination, or to any institution or society which is under sectarian or ecclesiastical control." 29 Stat. 683.

We can not agree with the learned justice who granted the injunction, that the foregoing declaration of a departure in public policy limits and controls the discretion of the District Commissioners in the matter of the contract under consideration. The act was approved March 3, 1897, and its appropriations are limited to the fiscal year ending June 30, 1898. The new policy is expressly declared to take effect and be in force *from and after June 30, 1898.*

How, then, is it possible to hold that an act, the purpose of which will have been accomplished on June 30, 1898, is to be restrained in its operation by a clause injected into it which does not come into existence and operation until *after* that date?

It is, indeed, difficult to conceive what effect this declaration or enactment can have in any event. Clearly it can not affect appropriations of money that will be exhausted before it takes effect; and it cannot bind the succeeding Congress when it comes to enact an appropriation bill for the year beginning July 1, 1898. It seems to be nothing more than a mere declaration of an abstract view of public policy that was not permitted to affect the operation of the act of which it was made a part, and that can not, for obvious reasons, control or limit expenditures under specific appropriations which may be similarly itemized and designated in the act of a succeeding Congress.

Payments under these special appropriations have not been embraced in this bill, and in referring to them, in considering the effect of the provision aforesaid which accompanies them, we are not to be understood as expressing an opinion in respect either of the power of Congress to grant money in aid of associations of persons engaged in works of

public charity, whether under sectarian control or not, or of the policy of so doing if the power exists.

As regards the policy that should prevail in the matter of the support of charities in the District, or the wisdom of contracting for the erection of buildings for such purposes upon other than public property, these are matters for the exclusive determination of Congress and it would not be within our province even to intimate an opinion thereon.

The sole question for our determination is the power of Congress and the District Commissioners in the matter of the appropriation and contract involved in this case.

Finding no valid objection to that power as exercised, we must reverse the decree with costs, and remand the cause with direction to dismiss the bill. *It is so ordered.*

*Reversed.*