*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-242

KIRBY VINING, APPELLANT,

v.

12/7/2017
FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

EXECUTIVE BOARD OF THE DISTRICT OF COLUMBIA
HEALTH BENEFIT EXCHANGE AUTHORITY, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-6496-14)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued March 2, 2016                    Decided December 7, 2017)

*Michael Bekesha* for appellant.

*Jason Lederstein,* Assistant Attorney General, with whom *Karl A. Racine,* Attorney General for the District of Columbia*, Todd S. Kim,* Solicitor General at the time the brief was filed, and *Loren AliKhan*, Deputy Solicitor General, were on the brief, for appellees.

Before GLICKMAN and EASTERLY, *Associate Judges*, and REID, *Senior Judge*.

GLICKMAN, *Associate Judge*: Kirby Vining appeals the dismissal of his taxpayer suit against the District of Columbia Health Benefit Exchange Authority and its Executive Director and Executive Board (collectively, the "Exchange

Authority"). Mr. Vining seeks declaratory and injunctive relief to stop what he claims is the Exchange Authority's illegal use of municipal funds to allow members of Congress, congressional employees, and their dependents to purchase health insurance on the small business exchange created by the District under the Patient Protection and Affordable Care Act. The Superior Court granted the District's motion to dismiss the complaint pursuant to Civil Rules 12 (b)(1) for lack of standing and 12 (b)(6) for failure to state a claim.[1]

We affirm the dismissal because Mr. Vining's status as a municipal taxpayer does not provide him with the standing necessary to maintain this action. We therefore do not reach the merits of Mr. Vining's claim of illegality, which turns on whether federal law preempts otherwise applicable District law.

**I.**

As enacted by Congress in 2010, the Patient Protection and Affordable Care Act (the "ACA")[2] envisioned that the States and the District of Columbia[3] would

---

[1] *See* Super. Ct. Civ. R. 12 (b)(1), (b)(6).

[2] Pub. L. No. 111-148, 124 Stat. 119 (2010), codified in large part at 42 U.S.C. § 18001 *et seq.*, as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

establish two marketplaces for the purchase of health insurance: an "American Health Benefit Exchange" for qualifying individual consumers and a "Small Business Health Option Program," or "SHOP Exchange," for small employers seeking group coverage for their employees.[4] The ACA defines a "small employer" eligible to use a SHOP Exchange as one with no more than one hundred employees, though it permits States to restrict access to employers with no more than fifty employees.[5]

In 2012, the Council of the District of Columbia created the Exchange Authority as an independent agency and directed it to establish the individual and small business exchanges necessary to implement the ACA.[6] The Exchange Authority Act defines a "small employer" eligible to participate in a District SHOP Exchange as one employing on average no more than fifty employees.[7] The

*(…continued)*

[3] The ACA includes the District of Columbia in its definition of "State." *See* ACA § 1304 (d).

[4] *Id.* § 1311 (b).

[5] *Id.* §§ 1304 (b)(2), (b)(3).

[6] *See* D.C. Code § 31-3171.01 *et seq.* (2012 Repl. & 2017 Cum. Supp.).

[7] *Id.* § 31-3171.01 (16)(A).

Council established a "nonlapsing" fund (the "Exchange Fund") exclusively for the Exchange Authority to draw on in order to carry out its responsibilities.[8]

The ACA also provided that after January 1, 2014, the Federal Government could make health insurance plans available to Members of Congress and congressional staff only through a State exchange.[9] In response to this provision, OPM issued final regulations in October 2013 requiring the Members and staff of Congress to enroll in a plan offered on the District of Columbia SHOP Exchange in order to receive federal contributions to their insurance premiums.[10] The Centers for Medicare and Medicaid Services in the Department of Health and Human Services issued interpretive guidance stating that size requirements for

---

[8] *See* D.C. Code § 3171.03. Monies deposited into the Exchange Fund, and interest earned thereon, "shall not revert to the unrestricted fund balance of the General Fund of the District of Columbia at the end of a fiscal year, or at any other time, but shall be continually available for the uses and purposes [of the Exchange Authority] without regard to fiscal year limitation, subject to authorization by Congress." *Id.* § 3171.03 (c).

[9] ACA § 1312 (d)(3)(D). Before this requirement took effect, the Federal Government provided health benefits to Members of Congress and congressional staff the same way it provided them to other federal employees, i.e., through the Federal Employee Health Benefits Act, 5 U.S.C. § 8901 *et seq.*, as administered by the Office of Personnel Management ("OPM"), *id.* § 8913.

[10] Federal Employees Health Benefits Program: Members of Congress and Congressional Staff, 78 Fed. Reg. 60653, 60654-56 (Oct. 2, 2013) (codified at 5 C.F.R. § 890 *et seq.* (2015)).

small employers to participate in SHOP Exchanges would not apply to Members of Congress and congressional staff.[11]

Mr. Vining sued the Exchange Authority in October 2014. His complaint alleged that since November 2013, the Exchange Authority had allowed at least 12,359 congressional employees and dependents to purchase health insurance on the District of Columbia SHOP Exchange, in contravention of the provision in the District's Exchange Authority Act restricting participation in the small business exchange to employers with fifty or fewer employees.[12] Mr. Vining further alleged that this "illegal" operation of the District's SHOP Exchange caused irreparable injury to his "interests as a taxpayer" because the Exchange Fund used to administer the Exchange included taxpayer money appropriated annually by the Council from the District's General Fund. The complaint requested the court to grant equitable relief, including a declaration that congressional participation in the District's SHOP Exchange was unlawful and an injunction barring the Exchange

---

[11]   Centers for Medicare and Medicaid Services, Affordable Insurance Exchanges Guidance: Members of Congress and Staff Accessing Coverage Through Health Insurance Exchanges (Marketplaces) (2013), https://perma.cc/XGZ3-C8VT.

[12]   See *supra* note 7. The complaint alleged that the 12,359 congressional employees and dependents represented approximately 86% of the total number of persons enrolled in the SHOP Exchange.

Authority from allowing such participation "or, at a minimum, from expending further taxpayer funds" thereon.

In moving to dismiss the complaint pursuant to Civil Rule 12 (b)(1) on standing grounds, the Exchange Authority denied that municipal taxes had been used to fund the District's SHOP Exchange. The Exchange Authority cited public District Government Budget Plans for fiscal years 2013 through 2015 showing that no general taxpayer revenues had been appropriated for its use and that it was funded only by federal grant monies and assessments levied on health insurance carriers.[13] In response, Mr. Vining contended that, as a District of Columbia taxpayer, he has standing to challenge the Exchange Authority's illegal expenditure of municipal funds whatever the source of those funds and regardless of whether municipal taxes are at issue. He also argued that the source of the funds is a factual question that could not be resolved on a Rule 12 (b)(1) motion prior to discovery, and that even if no municipal tax dollars had been used yet, they might have to be drawn upon in the future if the Exchange Authority were confronted with a revenue shortfall.

---

[13] *See* ACA § 1311 (a) (providing for federal grant assistance to states to establish exchanges); D.C. Code §§ 31-3171.03 (b)(1), (e), (f) (authorizing the Exchange Authority to assess health insurance carriers to fund its operations).

The Superior Court rejected Mr. Vining's argument. Citing cases linking municipal taxpayer standing to claims that actually do implicate municipal taxes, the court ruled that Mr. Vining "has not demonstrated a reasonable inference that municipal taxpayer funds have been appropriated to the defendant [E]xchange [A]uthority to establish a cognizable injury to maintain standing to bring his underlying complaint."[14] The court therefore granted the Exchange Authority's Rule 12 (b)(1) motion to dismiss for lack of standing.[15]

## II.

Mr. Vining contends that he has standing as a municipal taxpayer to bring this action to prevent the illegal expenditure of municipal funds by the Exchange Authority. He argues that the Superior Court erred in ruling otherwise, because it should not have made a finding prior to discovery as to whether Exchange

---

[14] Indeed, the court added, Mr. Vining "does not proffer any basis . . . to conclude that the . . . [E]xchange [A]uthority has received or is receiving municipal taxpayer funds beyond mere conjecture that the . . . [E]xchange [A]uthority will experience a funding shortfall."

[15] In the alternative, the Superior Court also agreed with the Exchange Authority's Rule 12 (b)(6) argument that the federal regulations implementing the ACA superseded the "small employer" restriction in D.C. Code § 31-3171.01 (16)(A) and authorized the Exchange Authority to allow Members of Congress and congressional staff to participate in the District's SHOP Exchange. We express no view on this issue.

Authority operations were funded with taxpayer money, and, in any event, because the source of the municipal funds used by the Exchange Authority is irrelevant to his standing to sue to restrain their illegal expenditure.  For the reasons that follow, we disagree.

## A.  Municipal Taxpayer Standing

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy[,]"[16] the words used in Article III of the Constitution to define the proper scope of "[t]he judicial Power of the United States."[17]  "No principle," the Supreme Court has declared, "is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[18]  In the District of Columbia, Congress has vested "[t]he judicial power" over local cases and controversies in

---

[16] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[17] U.S. Const. Art. III, §§ 1, 2.

[18] *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37 (1976)).

the Superior Court and this court.[19]  Although Congress established the two tribunals pursuant to Article I of the Constitution,[20] we conform our exercise of "judicial power" to the law of Article III standing.[21]

Constitutional standing requirements determine whether a plaintiff is "a proper party to request an adjudication of a particular issue" by virtue of having a genuine "personal stake" in the outcome.[22]  "[A] plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at

---

[19]  D.C. Code §§ 1-204.31 (a), 11-101 (2012 Repl.); *see also* D.C. Code § 11-705 (b) (2012 Repl.) (providing that the District of Columbia Court of Appeals hears and determines "[c]ases and controversies").

[20]  *Id.*, § 11-101 (2).

[21]  *Grayson v. AT&T Corp.*, 15 A.3d 219, 224 (D.C. 2011) (en banc) ("[E]ven though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III."); *see also, e.g.*, *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 42 (D.C. 2015) ("[W]e generally adhere to the case and controversy requirement of Article III, and look to federal standing jurisprudence when considering the issue of a plaintiff's standing."); *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002) (similarly applying case-and-controversy standing requirements).

[22]  *Grayson*, 15 A.3d at 229 & n.19 (internal quotation marks omitted).

large – does not state an Article III case or controversy."[23] Rather, "the 'irreducible constitutional minimum' of standing consists of three elements. . . . The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[24] The burden is on the plaintiff to establish each of these three elements.[25] To establish an "[i]njury in fact," the plaintiff must show that he has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[26]

---

[23] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992); *see also, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982) ("This Court repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law. . . ." (internal quotation marks omitted)).

[24] *Spokeo*, 136 S. Ct. at 1547 (citing, *inter alia*, *Lujan*, 504 U.S. at 560-61).

[25] *Id.*

[26] *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. The additional requirement of concreteness is meant to convey that the injury also "must actually exist," i.e., be "real," and not "abstract." *Spokeo*, 136 S. Ct. at 1548. Illustratively, an otherwise inconsequential violation of a plaintiff's merely procedural right – a deprivation "divorced from any concrete harm" – does not satisfy the injury-in-fact requirement. *Id.* at 1549.

To establish his standing to bring this case, Mr. Vining relies on his status as a municipal taxpayer suing to prevent the putatively unlawful expenditure of municipal funds. Generally speaking, taxpayers lack standing (as taxpayers) to challenge the lawfulness of governmental expenditures "because the alleged injury is not 'concrete and particularized,' but instead a grievance the taxpayer 'suffers in some indefinite way in common with people generally,'" and also because "the injury is not 'actual or imminent,' but instead 'conjectural or hypothetical.'"[27] But municipal taxpayer suits historically have been viewed differently, as the Supreme Court acknowledged in *Frothingham v. Mellon*.[28] Distinguishing such actions from suits by federal taxpayers, the *Frothingham* Court accepted the proposition that "resident taxpayers may sue to enjoin an illegal use of the moneys of a

---

[27] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (internal quotation marks and citations omitted). In *Cuno*, the Supreme Court held that state taxpayers lacked standing to challenge a state tax credit as a violation of the Commerce Clause. *See id.* at 349. In the leading case rejecting federal taxpayer suits to enjoin improper federal appropriations, the Court explained that the taxpayer's "interest in the moneys of the treasury – partly realized from taxation and partly from other sources – is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923).

[28] 262 U.S. 447 (1923). *Frothingham* was a companion case to *Massachusetts v. Mellon*, *supra* note 27; the Supreme Court decided the two appeals in the same opinion.

municipal corporation" on the premise that "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate."[29] Although it has been cogently argued that *Frothingham*'s endorsement of municipal taxpayer standing is "on its face inconsistent with current principles of constitutional standing,"[30] the doctrine has not been repudiated. For present purposes, we assume the continued viability in the District of Columbia of the proposition that municipal taxpayers have the right, "in the proper case, to initiate suit against the city government to prevent illegal use of municipal funds."[31]

---

[29] *Frothingham*, 262 U.S. at 486 (citing *Roberts v. Bradfield*, 12 App. D.C. 453, 459-60 (1898), *aff'd*, 175 U.S. 291 (1899) and *Crampton v. Zabriskie*, 101 U.S. 601, 609 (1880)). The Court somewhat cryptically observed that "[t]he reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation." *Id.* at 487. The analogy appears to be that taxpayers are considered the equitable owners of municipal funds by virtue of their tax contributions to those funds, just as stockholders have an interest in the funds of their corporation. *See* 74 Am. Jur. 2d *Taxpayers' Actions* §§ 2, 13 (2012); *cf. Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 285 (6th Cir. 2009) ("Like a shareholder of a private corporation, a municipal taxpayer has an immediate interest in how the municipality spends resources that reflect his contributions.").

[30] *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988) (Williams, J., concurring).

[31] *Calvin-Humphrey v. District of Columbia*, 340 A.2d 795, 799 (D.C. 1975) (dictum, citing *Roberts*, *supra* note 29, and *Massachusetts v. Mellon*, *supra* note 27).

Even so, the Supreme Court has clarified that a municipal taxpayer's suit can satisfy the "case or controversy" requirement of Article III "only when it is a good-faith pocketbook action" complaining of "a direct dollars-and-cents injury."[32] This court accordingly has understood the municipal taxpayer standing doctrine to mean that "a taxpayer may sue a municipal corporation to enjoin the misuse or misappropriation of funds [that] such corporation *derives from taxes paid by such local taxpayers*."[33] It is at least plausible to say that a municipal taxpayer suffers what the *Frothingham* Court called a "direct and immediate" (if typically small) pecuniary injury from the unlawful expenditure of *his tax dollars* because such an expenditure might be said to increase his tax burden. But if the municipality's unlawful expenditure is not funded by his taxes, he cannot be said to suffer such direct harm from the expenditure – let alone what the Supreme Court's more recent decisions describe as an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Without a link between his municipal taxes and the challenged municipal expenditure, he is in the position of raising only a commonly available grievance and "seeking relief that no more

---

[32] *Doremus v. Bd. of Educ. of the Borough of Hawthorne*, 342 U.S. 429, 434 (1952).

[33] *Debevoise v. Back*, 359 A.2d 279, 280 (D.C. 1976) (emphasis added). It appears that this 1976 decision was the last case in which this court had occasion to mention municipal taxpayer standing.

directly and tangibly benefits him than it does the public at large."[34]   Thus, "municipal taxpayers do not have standing [to sue to enjoin municipal expenditures] when no tax moneys are spent."[35]

Mr. Vining takes issue with this conclusion, at least insofar as the local courts of the District of Columbia are concerned.  He argues that binding precedent in this jurisdiction from the nineteenth and early twentieth centuries requires us to hold that a District of Columbia taxpayer has the right to sue in Superior Court to prevent the illegal expenditure of municipal funds regardless of the source of those funds or whether taxpayer monies are in any way at stake.  The cases involving the

---

[34] *Lujan*, 504 U.S. at 573-74.

[35] *District of Columbia Common Cause*, 858 F.2d at 4; *see also, e.g.*, *ACLU-NJ ex rel. Miller v. Twp. of Wall*, 246 F.3d 258, 264 (3d Cir. 2001) ("[W]e cannot find that plaintiffs have carried their burden of proving an expenditure of revenues to which they contribute that would make their suit a good-faith pocketbook action.  Consequently, plaintiffs cannot invoke federal jurisdiction as [municipal] taxpayers."  (internal citations and quotation marks omitted)); *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996) ("Municipal taxpayer status does not confer standing absent some allegation by the plaintiffs of an illegal use of tax revenues."); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408 (5th Cir. 1995) ("In order to establish . . . municipal taxpayer standing . . . a plaintiff must not only show that he pays taxes to the relevant entity, he must also show that tax revenues are expended on the disputed practice."); 74 Am. Jur. 2d *Taxpayers' Actions* § 37 (municipal taxpayers generally cannot enjoin the wrongful expenditure of funds not raised by taxation, and "the mere possibility that under some circumstances the taxing unit might be required to make up a deficiency with public funds is insufficient to entitle the taxpayer to maintain a bill in equity").

expenditure of municipal funds that Mr. Vining cites – *Roberts v. Bradfield*[36] and *B. F. Cummins Co. v. Burleson*[37] – did not go nearly so far, however. They say (in what we take to be dicta) that a municipal taxpayer may sue to prevent the misuse of municipal funds, but they do not address at all whether such a taxpayer may do so when no tax dollars are involved in the misuse.[38] We therefore cannot view the cases on which Mr. Vining relies as having decided the question or as foreclosing us from doing so now. "The rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question."[39] Particularly where the question is one of subject-matter jurisdiction, as the question of standing is here, prior decisions that overlooked the issue cannot bind us when it finally is presented to us for

---

[36] *Supra* note 29.

[37] 40 App. D.C. 500 (D.C. Ct. App. 1913).

[38] *See Roberts*, 12 App. D.C. at 459-60; *Burleson*, 40 App. D.C. at 508-09. Two other cases cited by Mr. Vining are even less on point. *Wheless v. Mellon*, 10 F.2d 893 (D.C. Ct. App. 1926), involved a federal taxpayer's suit to restrain a federal government expenditure, which was barred by the Supreme Court's decision in *Frothingham*. The only reference in *Wheless* to municipal taxpayer actions was in a quotation from *Frothingham*. 10 F.2d at 894. And *Calvin-Humphrey*, *supra* note 31, involved no issue of taxpayer standing to sue and merely mentioned in dicta that taxpayers could sue to prevent illegal use of municipal funds "in the proper case." 340 A.2d at 799.

[39] *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994).

decision.[40]    But even if these older cases actually had held that a municipal taxpayer can sue to prevent spending that does not implicate his tax dollars, the "jurisprudential basis" of that hypothetical ruling has been so "substantially undermined" by subsequent standing decisions of the Supreme Court that *stare decisis* "does not oblige us to follow" it.[41]

We therefore hold that a municipal taxpayer does not have standing to sue to prevent expenditures if his tax dollars do not contribute to them.

## B.  The Source of the Exchange Authority's Funds

In order to refute the allegation in Mr. Vining's complaint that the Exchange Authority utilized municipal tax revenues, the Exchange Authority relied primarily on the District's Budget and Financial Plans for the fiscal years in question (2013 to 2015).  Because the Budget Plans are legislative enactments transmitted to Congress in conjunction with the annual Budget Request Acts,[42] the Superior Court

---

[40]    *See id.* (citing *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974)).

[41]    *See Smith v. United States*, 984 A.2d 196, 200 (D.C. 2009); *see also, e.g.*, *Frendak v. United States*, 408 A.2d 364, 379 n.27 (D.C. 1979).

[42]    *See* D.C. Code § 1-204.46 (2016 Repl.).  The budget documents for each fiscal year are available to the public, *see* D.C. Code § 1-204.42 (a) (2016 Repl.),

*(continued…)*

could take judicial notice of them (as can this court).[43]  It was permissible for the Superior Court to consider these documents when it did because "a trial court's jurisdictional inquiry under Rule 12 (b)(1) may extend beyond the facts pled in the complaint" to encompass evidence submitted by the parties without thereby converting the motion into one for summary judgment.[44]  When the jurisdictional challenge is thus expanded, the plaintiff bears the burden of proof without the benefit of any presumption that the allegations of the complaint are true.[45]  Thus, in responding to the 12 (b)(1) motion, Mr. Vining also cited budget documents outside the four corners of the complaint.  We therefore are not persuaded by his claim that the Superior Court ruled prematurely on the question of his standing.

The Budget Plans proffered by the Exchange Authority state that its funding derived from sources other than local taxes.  As Mr. Vining has not seriously

---

*(…continued)*

and may be found on the website of the District's Office of the Chief Financial Officer at http://cfo.dc.gov under the heading "Budget and Revenue."

[43] *See Bostic v. District of Columbia*, 906 A.2d 327, 332 (D.C. 2006).

[44] *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015).

[45] *Id.* at 43 n.19 (citing *Heard v. Johnson*, 810 A.2d 871, 878 (D.C. 2002)).

disputed that fact,[46] we need only provide a brief summary of what each Budget Plan discloses. For fiscal year 2013, the year in which the Exchange Authority commenced its operations, the Budget Plan provided that it would be funded by federal grant monies totaling $53,543,000 through the District's Department of Health Care Finance ("DHCF").[47] For fiscal year 2014, the gross budget of the Exchange Authority was $66,140,499, to be funded by a "sub-grant" from DHCF of unused federal grant money from the preceding year plus assessments levied on health insurance carriers.[48] Finally, the Exchange Authority was budgeted to receive $28,751,244 for fiscal year 2015, all of it from assessments on insurance carriers.[49]

---

[46] Mr. Vining argued that the Exchange Authority may have received municipal tax money because, according to the fiscal year 2015 Budget Plan, its funds had come through the District's General Fund – which the Budget Plan defined as the District's "principal operating fund" comprising "Local, Dedicated Tax, and Special Purpose Revenues." However, as set forth above, the more specific information about the source of the Exchange Authority's funds contained in the Budget Plans contradicted Mr. Vining's supposition. He proffered nothing to refute the specific statements in the Budget Plans regarding the sources of the Exchange Authority's funds.

[47] *See* FY 2013 Proposed Budget and Financial Plan, Vol. 3 – Agency Budget Chapters Part II, pp. E-189, E-195.

[48] *See* FY 2014 Proposed Budget and Financial Plan, Vol. 3 – Agency Budget Chapters Part II, pp. H-86.

[49] *See* FY 2015 Proposed Budget and Financial Plan, Vol 4 – Agency Budget Chapters Part III, pp. E-199, E-202, H-84, H-88.

The foregoing information presented to the Superior Court, not substantively challenged by Mr. Vining, supported the court's conclusion that he had "not demonstrated a reasonable inference" that the Exchange Authority spent municipal taxpayer funds.[50] Mr. Vining argues that if the Exchange Authority ever experiences a shortage of funds, the District Government might be required to allocate monies from the General Fund in order to administer the SHOP Exchange, which would mean drawing on municipal tax dollars. But he has proffered no reason to think there will be a funding shortfall. The possibility is wholly speculative, especially since in 2015 the Council directed the Exchange Authority to continue to support its operations through assessments levied on health carriers.[51] Standing requires harm that is "actual or imminent, not conjectural or hypothetical."[52]

---

[50] Moreover, since monies in the Exchange Fund cannot "revert" to the General Fund under any circumstances, see *supra* note 8, those monies cannot be redeployed to reduce the municipal tax burden on Mr. Vining and other District residents.

[51] *See* D.C. Code § 31-3171.03 (f) (2017 Cum. Supp.).

[52] *Lujan*, 504 U.S. at 560. Even if Mr. Vining might have standing in the future if his hypothetical scenario of a funding shortfall requiring resort to municipal taxes comes to pass, his claim is nowhere near ripe for adjudication at this time. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in

*(continued…)*

For the foregoing reasons, we hold that Mr. Vining has not borne his burden to show he has municipal taxpayer standing to sue to enjoin the Exchange Authority's use of municipal funds to allow Members of Congress and their staff to participate in the SHOP Exchange. We therefore affirm the dismissal of his complaint pursuant to Rule 12 (b)(1).

*So ordered.*

---

*(…continued)*
abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Local 36 Int'l Ass'n of Firefighters v. Rubin*, 999 A.2d 891, 895-96 (D.C. 2010) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003)). "We may raise the issue of ripeness *sua sponte* even though neither party has discussed it in its briefs." *Id.* at 896.