THE BOOTERY, INC., et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY et al., Defendants.

Civ. A. No. 1401–70.

United States District Court, District of Columbia.

Nov. 24, 1970.

Order and Judgment, Jan. 6, 1971.

Amended Order and Judgment, Jan. 8, 1971.

Leonard N. Bebchick, Stanley O. Sher, Bebchick, Sher & Kushnick, Washington, D. C., for plaintiffs.

Thomas Bell, Asst. Corp. Counsel, District of Columbia, for defendants, District of Columbia, Walter E. Washington and Kenneth Back.

Jerome M. Alper, Peter A. Greenburg, Lawrence M. Mann, Bernstein, Alper, Schoene & Friedman, Washington, D. C., for defendant, Washington Metropolitan Area Transit Authority.

## MEMORANDUM OPINION

PARKER, District Judge.

In this action plaintiffs, two District of Columbia taxpayers, both operators of businesses and leaseholders of property situated along one of the lines of the proposed Metropolitan Area Subway Line (hereinafter the System), bring suit against the Washington Metropolitan Area Transit Authority (hereinafter Authority or WMATA) as well as the District of Columbia and certain of its officials.

They seek a declaratory judgment that the Authority created by virtue of the Washington Metropolitan Area Transit Authority Compact[1] (hereinafter the Authority Compact) has failed, in various ways, to fulfill properly its statutory obligations regarding public hearings concerned with the location and design of subway stations and regarding a plan for financing the proposed subway system. They further seek to enjoin the Authority from proceeding with construction and entering into further obligations. Injunctive relief is also sought against the District of Columbia, Walter E. Washington, Commissioner, and Kenneth Back, Finance Officer, to prohibit further disbursement of funds or creation of additional obligations to expend funds for the System until the alleged deficiencies are remedied, including *de novo* consideration of alternative proposals for station access points.

The plaintiffs present three general challenges: the Mass Transit Plan (hereinafter the Transit Plan)[2] was illegally adopted on March 1, 1968, since it failed to specify precise locations for station access points and further failed to give proper consideration to the possible dislocation of families and businesses affected by station site location; the public hearings were deficient, both in violation of the language of the Authority Compact, 5th and 14th Amendment due process, and 14th Amendment equal protection guarantees; and financing proposals for constructing the System were illegal because the Financial Plan does not contain the specification required by the Compact, the proposed methods of financing are inadequate and unrealistic, and requirements of the Plan have not been complied with.

The Authority questions the plaintiffs' standing to bring suit. It further contends that the Compact does not require that the Mass Transit Plan designate the specific properties to be taken for station access points or that the access points be the subject of a public hearing for the adoption of a Mass Transit Plan; and that the public hearings held prior to the adoption of the proposed Mass Transit Plan, or in any event, the post-hearing evaluation procedure of the Board, satisfied the requirements of the Compact. It also asserts that the long-range financial capacity of a municipality to support massive public works projects cannot be challenged by the plaintiffs, is not reviewable by this Court, and constitutes an improper collateral attack on the validity of the bond referenda held by the various jurisdictions. The Authority also contends that a taxpayer's suit must be maintained as a class action, but that the plaintiffs represent interests adverse to those of taxpayers generally in the District of Columbia, and therefore, the action may not be maintained as a class or taxpayer's action.

The Authority has filed a motion to dismiss and/or for summary judgment. Plaintiffs also filed a cross motion for summary judgment on the issue of the

1. Title III, 80 Stat. 1324, Pub.L. 89–774, § 1, Nov. 6, 1966, Noted to 1 D.C. Code 1431 (1967 Ed.).

2. Exhibit attached to Minutes of 72nd Meeting of WMATA Board of Directors, March 1, 1968.

798

Transit Plan but not as to the Financial Plan. The defendants District of Columbia, Walter E. Washington and Kenneth Back, have filed a motion to dismiss the complaint alleging that they are neither necessary nor indispensable parties.

For the reasons herein the Court concludes that: the plaintiffs have standing to challenge compliance with the requirements for the Mass Transit Plan, the sufficiency of the hearing procedures, compliance with the requirements for the Financial Plan and compliance with the Financial Plan itself; plaintiffs' motion for summary judgment should be granted as to the Mass Transit Plan hearings; the defendant Authority's motion for summary judgment should be denied as to the Mass Transit Plan hearings but granted as to the Financial Plan objections: and the motion of the defendants District of Columbia, Walter E. Washington and Kenneth Back should be denied.

## STANDING

The contention that plaintiffs lack standing to bring this action has little merit. Plaintiffs do have the necessary status to challenge both the Authority's compliance with the requirements of the Compact and the compliance of the District of Columbia. " * * * [A] compact is after all a legal document * * *" West Virginia ex rel. Dyer, et al. v. Sims, State Auditor, 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). And the "meaning and validity of compacts" are subject to judicial review. Id., at 28, 71 S.Ct. 557, 95 L.Ed. 713. To hold that the

Compact is an agreement between the political signatories imputing only to those signatories standing to challenge actions pursuant to it would be unduly narrow in view of the direct impact on plaintiffs and other taxpayers.

 The Constitution [3] makes the consent of Congress the only clear, albeit necessary, relationship of the Federal Government with an interjurisdictional compact. But the Constitution [4] gives to Congress the power to " * * * legislate within the District for every proper purpose of Government. Within the District of Columbia, there is no division of legislative powers such as exists between the federal and state governments. Instead there is a consolidation thereof." Neild v. District of Columbia, 71 App. D.C. 306, 309, 310, 110 F.2d 246, 249, 250 (1940). (Footnotes omitted.) See also, District of Columbia v. John R. Thompson Co., 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953); Berman v. Parker, 348 U.S. 26, 31, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

 Thus the Washington Metropolitan Area Transit Regulation Compact [5] had "authorized and *directed* the Board of Commissioners of the District of Columbia to enter into and execute the Authority Compact *on behalf of the United States for the District of Columbia.* * * *" [6] (Emphasis added). And Congress "*adopts and enacts for* the District of Columbia," [7] as well as "consents to," [8] the creation of the Washington Metropolitan Area Transit Authority. (Emphasis added). The Authority itself

3. U.S.Const., Art. I, § 10, cl. 3. "No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."

4. U.S.Const., Art. I, § 8, cl. 17. "[The Congress shall have Power] * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten miles square) as may, by

Cession of Particular States, and the Acceptance of Congress, become the Seat of the Government of the United States * * *"

5. 74 Stat. 1031, Pub.L. 86–794, § 1 (Sept. 15, 1960), noted to 1 D.C.Code 1410 (1967 Ed.).

6. Preamble to the Oct. 9, 1962 amendment to the Regulations Compact, *supra*, (Pub. L. 87–767, 76 Stat. 764).

7. 1 D.C.Code 1431 (80 Stat. 1324, Pub.L. 89–774, § 1, Nov. 6, 1966).

8. *Id.*

is merely an agency of each of the signatory parties [9] including the United States on behalf of the District of Columbia, *supra*.[10]

In view of the federal interest in the Compact, there appears no reason why the general criteria for standing to challenge action under a federal statute should not be employed. Ass'n of Data Processing Service Organizations, Inc., et al. v. Camp., et al., 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow, et al. v. Collins, et al., 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Scanwell Laboratories, Inc. v. Thomas, et al., 424 F.2d 859 (D.C.Cir., filed Feb. 13, 1970); Ballerina Pen Co., et al. v. Kunzig, et al., 433 F.2d 1204 (D.C.Cir., filed April 24, 1970).

The plaintiffs clearly meet the criteria applied in those cases. The actions of the Authority in condemning their leaseholds would cause them injury in fact; the plaintiffs have alleged that the Authority acted arbitrarily and contrary to its statutory authority; there is no clear and convincing indication of a legislative intent to withhold judicial review [11] and the interest of the plaintiffs is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," Ass'n of Data Processing v. Camp., et al., *supra*, 397 U.S. at 153, 90 S.Ct. at 830, since the Authority Compact makes provision for consideration of the effects of dislocation on business,[12] and the plaintiffs raise an issue of due process either under the Authority Compact or the Constitution of the United States.[13] The Plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of

issues upon which the court so largely depends for illumination of difficult * * * questions * * *." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed. 2d 663 (1962); Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).

Decisive weight is further provided by recent decisions which have given relocatees in urban renewal projects under the National Housing Act,[14] standing to sue to enjoin arbitrary, capricious, or other unlawful or statutorily inadequate actions of agencies administering the program. Norwalk Core v. Norwalk Redev. Agency, 395 F.2d 920 (2d Cir. 1968); Powelton Civic Home Own. Ass'n v. H. U. D., 284 F.Supp. 809 (E.D.Penn.1968); Western Addition Community Organization, et al. v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968). Since the Authority Compact [15] itself provides sufficient basis for these plaintiffs' standing to review the business dislocation provisions of the Mass Transit Plan, the Court need not consider whether all taxpayers of the District are entitled to such standing.

With respect to the Financial Plan, plaintiffs' standing to sue the Authority arises from their long-accepted standing as taxpayers. Massachusetts v. Mellon, 262 U.S. 447, 486, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Crampton v. Zabriskie, 101 U.S. 601, 609, 25 L.Ed. 1070 (October Term, 1879); Downing v. Ross, 1 App.D.C. 251, 254 (1893); Roberts v. Bradfield, 12 App.D.C. 453, 459, 460 (1898), affirmed Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899). And as an agency of the District Government supported in part by District taxpayers' revenues,[16] the Authority

---

9. Authority Compact, *supra*, Art. II, § 2; Art. III, § 4.

10. Preamble to Oct. 9, 1962 amendment, *supra*.

11. See Authority Compact, *supra;* 112 Cong.Rec. 20550–20561, 25650–25685, 26526–26536 (1966); H.R.Rep.No.1914, 89th Cong., 2d Sess. (1966); S.Rep.No. 1491, 89th Cong., 2d Sess. (1966).

12. Art. VI, § 14(c) (1), *infra*, at 10.

13. See also Admin.Pro.Act, 5 U.S.C. § 702, Pub.L. 89–554, 80 Stat. 392, Sept. 6, 1966.

14. 42 U.S.C. § 1441 et seq., as amended.

15. Art. VI, § 14(c) (1), *infra*, at 10.

16. Authority Compact, Art. II, § 2, Art. III, § 4.

should likewise be subject to such tax-payer scrutiny. Regarding the Authority's actions, the plaintiffs show that they are "immediately in danger of sustaining some direct injury as the result of its enforcement, not merely that * * * [they suffer] * * * in some indefinite way in common with people generally." Massachusetts v. Mellon, *supra,* 262 U.S. at 487, 488, 43 S.Ct. at 601.

■ Also the Court need not decide whether, as the Authority contends, a taxpayer suit must always be maintained as a class action for the Court is convinced that plaintiffs' action qualifies as a class action and the order of this Court will so designate. The Court agrees with the plaintiffs' observation that "Disinterested persons seldom are inclined to investigate, expose and challenge Government illegality in public projects." [17] And any inconsistency between the interests of the plaintiffs and those of other taxpayers are minimal and remote.

Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), cited by the Authority, is clearly distinguishable. There a suit was brought to enjoin the violation of a racially restrictive agreement among private property owners. Accordingly, any obligations under that agreement were restricted to the terms of the agreement and ran only to the other parties to the agreement and not the public at large; and the issue was such that any dispute with the agreement had to be diametrically opposed to all the interests of those seeking to uphold the agreement. Similarly, the other cases cited by the defendant indicate that a class is barred because of adverse interests only where there is "substantial conflict within the class over the very issue in litigation." Mersay v. First Republic Corporation of America, 43 F.R.D. 465, 468 (S.D.N.Y. 1968). It is clear that the plaintiffs' primary interest is to reap the benefits of retaining their locations near the completed subway station, not to delay or prevent construction of the subway.

## MASS TRANSIT PLAN "HEARINGS"

Plaintiffs claim that the Transit Authority, in executing the Mass Transit Plan, has denied due process in violation of the express and implied terms of the Authority Compact and the provisions of the Fifth and Fourteenth Amendments of the Constitution, and equal protection in violation of the Fourteenth Amendment. More precisely they object to the alleged failure of the Authority to provide adequate public hearings at which businesses and residents who would probably be dislocated could challenge the Authority's proposals and present alternatives. They also suggest that such hearings are being provided in Virginia and Maryland. Significantly, plaintiffs modified their original position by conceding that, because of the nature of large-scale public works engineering, the initial Mass Transit Plan, adopted March 1, 1968, probably could not, and should not have been more explicit. But they assert that subsequent hearings were required as details of design evolved.

■ We do not understand the plaintiffs as claiming that the Authority cannot take their property; nor that this Court should substitute its judgment for that of the Authority, for such would be impermissible. Berman v. Parker, *supra,* 348 U.S. at 32–36, 75 S.Ct. 98, 99 L.Ed. 27. We do understand the plaintiffs to contend that it is their right and the intent of the Authority Compact that the actions of the Authority should be based on considerations including dislocation, and that residents and businesses affected should have an adequate opportunity to make a meaningful contribution to the Authority's determinations. The Court agrees with this contention but finds it unnecessary to reach any constitutional challenges because it is convinced that the language and clear intent of the Compact require that an affected party have an adequate opportunity to challenge the Authority's proposals as they may adversely affect his or her interests.

17. Plaintiffs' memorandum in opposition to defendant WMATA's motion to dismiss and/or motion for summary judgment, at 5.

The purpose of the Washington Metropolitan Area Transit Authority Compact, was

"to create a regional instrumentality as a common agency of each signatory party, empowered, * * * [*Inter alia*] (1) to plan, develop, finance and cause to be operated improved transit facilities, in coordination with transportation and general development planning for the Zone, * * *" Art. II, § 2.

The Authority Compact provides that the Board of Directors of the Authority, (hereinafter the Board), * * * "shall develop and adopt, and may from time to time review and revise," Art. VI, § 13(a), a Mass Transit Plan which includes " * * * the transit facilities * * *, including the locations of terminals, stations, platforms * * * and the character and nature thereof; (2) the design and location of such facilities; (3) *whether such facilities are to be constructed or acquired by lease, purchase or condemnation*; * * *" (Emphasis added). *Id.* "Transit facilities" is defined to include " * * * stations, terminals * * * and all buildings and structures * * * incidental to or required in connection with the performance of transit service; * * *" Art. 1., § 1(f). "The Board, in the preparation, revision, alteration or amendment of a Mass Transit Plan, shall

"(1) consider * * * impact of transit plans on the dislocation of families and businesses, * * * [and]

"(2) cooperate with and participate in any continuous, comprehensive transportation planning process cooperatively established by the highway agencies of the signatories and the local political subdivisions in the Zone to meet the planning standards now or hereafter prescribed by the Federal-Aid Highway Acts; * * *" Art. VI., § 14(c).

Art. XVI, § 82(a) provides that "the authority shall have the power to acquire by condemnation, whenever in its opin-ion it is necessary or advantageous to the Authority to do so, any real or personal property, or any interest therein, *necessary or useful* for the transit system. * * *" (Emphasis added).

The Authority Compact also provides that before a Mass Transit Plan is adopted, altered, revised or amended, it shall be transmitted to at least 11 local and regional entities, Art. VI., § 15(a); further, that "Information with respect thereto shall be released to the public * * * [and after adequate public notice] * * * a public hearing shall be held with respect to the proposed plan alterations, revision or amendment. * * * The Board shall consider the evidence submitted and statements made at such hearing and may make any changes in the proposed plan, amendment or revision which it deems appropriate and such changes may be made without further hearing." *Id.*

Pursuant to its mandate the Authority held one public hearing in the District and several in both Maryland and Virginia, prior to the March 1, 1968 approval of the Plan.

Uncontradicted portions of the Authority's pleadings leave little doubt that the public was sufficiently aware of the hearings. Notices were published in the daily press, and pre-hearing briefings were conducted by the Authority staff for business and civic groups and for the public. One such briefing was held in the District of Columbia on January 3, 1968 where questioning was conducted by a panel of representatives of various District civic organizations.[18]

Although the District hearings were scheduled to continue for as many days as necessary to accommodate the interested speakers, and many community-oriented organizations were represented, the hearings lasted less than two hours. The testimony of Mr. Frank L. Bias, President of the Connecticut Avenue Businessmen's Association (hereinafter the CABA), of which the plaintiffs are

---

18. Answers 16 and 31 to plaintiffs' interrogatories, filed July 31, 1970.

members, constituted only five lines of the official transcript, punctuated by the statement: " 'Stop talking. Start digging.' " [19]

In addition to the clear unanimity of community support for the System, and a limitation of ten minutes for each speaker's oral presentation, the brevity of the hearings can be explained by the limitation of the public details of the proposed plan to a specification of the so-called "corridor route" and a general designation of the area in which proposed stations were to be located but without detail as to which properties would have to be taken.[20]

The pre-hearing information made available to the public indicated only that

"Stations will be located in areas readily accessible to the greatest number of people in residential areas and to jobs in commercial centers. Consideration was given in spacing stations to provide optimum service by eliminating unnecessary stops so as to assure fast running times. Near downtown, stations were located near job centers to attract the greatest number of walk-in passengers. In residential areas, the stations were designed to be accessible to pedestrians, but also to facilitate fast and efficient feeder-bus access. At suburban stations, parking lots will be provided for those persons wishing to reach the system by automobile, either as a driver or as a passenger." [21]

■ In deciding whether the Authority's reading of the Compact is not reasonable or lacks rational foundation, the Court will apply an attitute of reasonable strictness because of the severe result of depriving the plaintiffs of their property. Gulf Oil Corporation, et al. v.

Hickel, et al., 435 F.2d 440 at 444 (D.C. Cir., filed Oct. 19, 1970). Thus, while the hearings that were provided may have been satisfactory at that stage of the planning process, the trend of judicial decisions leads this Court to interpret the Authority Compact as requiring more. In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court, requiring states to afford an evidentiary hearing to public assistance recipients prior to termination of payments, extended the doctrine that " 'the fundamental requisite of due process of law is the opportunity to be heard.' " at 267, 90 S.Ct. (Citation omitted).

In D. C. Federation of Civic Ass'ns, Inc., et al. v. Volpe, et al., 434 F.2d 436 (D.C.Cir., filed April 6, 1970), holding that Section 23 of the Federal-Aid Highway Act of 1968,[22] requires a public hearing for residents of the District of Columbia with regard to the so-called Three Sisters Bridge, dicta by Associate Judge Wright emphasized that while "the right to participate in a highway hearing is not the exact equivalent of the right to vote on the project * * * the similarities are strong." Id., 434 F.2d at 442. "This formal, regularized procedure, with due notice to all concerned, subjects officials to the differing views of competing interest groups and forces them to take account of prevailing views *while the project plans are still being formulated.*" Id., 434 F.2d at 442 (Footnote omitted.) (Emphasis added.)

■ The provisions of the Authority Compact that property taken be "necessary or useful," Art. XVI, § 82(a), *supra,* and that the Board's proposed Plan designate whether facilities are to be "constructed or acquired by lease,

---

19. Transcript of Public Hearing, Regional Rapid Transit Plan and Program, Jan. 15, 1968, at p. 43. All of the Board members received copies of the transcript prior to March 1, 1968. (Answers 18 and 19 to plaintiffs' interrogatories, at p. 5).

20. See Map, Proposed Regional Rapid Rail Transit Plan and Program, December 1967, at 5, Exhibit A attached to points and authorities in support of plaintiffs' motion for summary judgment.

21. WMATA Technical Report No. 1, System Planning, Dec. 1967 at p. 55.

22. Pub.L.No. 90–495, 82 Stat. 827–828 (1968).

purchase or condemnation," Art. VI, § 13(a) (3), strongly indicate a concern that a taking be soundly justified and that those likely to be affected be so apprised prior to the date of hearings. See Powelton Civic Home Owners' Ass'n v. H. U. D., *supra*, 284 F.Supp. at 831. The decisions of the Authority must be based on a complete record expressing the views of all recognized interests, particularly those interests expressly recognized by the Compact. *Id.*, at 832. Even the Congressional debates indicate a concern for the "political responsibility and responsiveness" of the Authority.[23]

And while we need not consider plaintiffs' claim that certain public hearings provided to Maryland and Virginia citizens involved sufficiently more detail of design and location than that provided to District citizens as to amount to a denial of equal protection guarantees, the specificity evident from the Transit Authority *Metro Memo*, No. 21, Oct. 1970,[24] concerning recent hearings in Alexandria supports the possibility of the requested procedure.

Flexibility should be accorded the Authority in determining the precise nature of such hearings on the basis of technical considerations.[25] Of course additional pre-hearing and post-hearing technical consultation with the Authority Staff—as was apparently true to a limited degree in the instant case—would also be appropriate. Cross-examination would be pointless and possibly engender animosity in what should be a cooperative fact-finding hearing, but counsel and experts for the parties should be given an opportunity to criticize the Authority's proposals and to present their own alternatives and respond to criticisms of those alternatives. Clearly distinguishable is Powelton Civic Home Owners' Ass'n v. H. U. D., *supra*, 284 F.Supp. at 829–830, where the court's refusal to require adversary hearings was based largely on the fact that urban renewal relocations would involve large numbers of relocatees in each hearing. Here the Authority will be confronted with only relatively few displacees for any one station; and the hearings for the various stations will be spread throughout several years as design and construction progresses along the proposed routes.

But this is not the end of our inquiry for the Authority has alleged that the plaintiffs' own alternative proposals and the plaintiffs' criticisms of the Authority Staff's proposals received fair and adequate consideration. The Court must therefore determine whether these plaintiffs have in fact been prejudiced by a lack of the type of hearings the Court prescribes today.

The Authority's answers to interrogatories submitted by the plaintiffs indicated that as early as "the fall of 1967, * * * various drawings of that period indicated that a portion of the area occupied by plaintiffs would be needed for access. [However, a]ll such indications were tentative and * * * the staff did not definitely know that plaintiffs' leaseholds would be required until the real estate certification was made by the Office of Engineering on November 21, 1969." [26] A station access plan was approved by the National Capital Planning Commission (hereinafter the NCPC), the central planning agency for the Federal and District Governments,[27] on January

---

23. See Statements of Rep. Broyhill, 112 Cong.Rec. 25662 (1966) and Rep. Edwards, 112 Cong.Rec. 25667 (1966).

24. Attached to plaintiffs' Supplemental Memorandum filed Nov. 9, 1970. See especially p. 2.

25. An excellent guideline is the two-stage hearing procedure envisioned by the Secretary of Transportation's Regulations, 23 C.F.R. Part 1, Appendix A (1970), pursuant to § 128 of the Federal-Aid Highway Act of 1968, *supra*. A location hearing is held before a specific route has been accepted; then a design hearing is held after the specific route has been approved but before the Authority is committed to detailed final designs.

26. Answer 5 to plaintiffs' interrogatories, at p. 3.

27. 1 D.C.Code § 1002.

11, 1968,[28] and shortly thereafter the Authority made a request for a preliminary title binder for the space occupied by plaintiffs.[29]

On November 4, 1969 the Transportation Committee of the NCPC held a public hearing to consider the Authority's final design for the Farragut North Station. At two later meetings [30] the Authority Board considered an alternate CABA proposal, earlier submitted to the NCPC Transportation Committee, and a critical Staff analysis. Plaintiffs' counsel were present at the latter three meetings, but were unprepared to respond to criticisms of the CABA plan on December 11 because of the uncontradicted allegation that no notice had been given of the Staff's position, and were not allowed to respond on December 24.[31]

Plaintiffs were formally advised by certified mail dated February 11 and 17, 1970, respectively, that the Authority's final design plan had been approved and that their leaseholds would be taken.

The Court need not examine plaintiffs' allegations that the Authority Staff was biased and unfair in its treatment of plaintiffs and the latters' alternative proposal, for it is clear that the Board has shirked its responsibility by providing inadequate opportunity for the plaintiffs to address the Board itself. Great deference must be given to the Staff expertise, particularly in a hearing confined to fact-finding rather than adjudication or rule making. But although prejudice on the part of the Staff will not be presumed, it is at least arguable that the Staff has a vested interest in encouraging the acceptance of its own painstakingly developed proposals, especially when the disagreeable possibility of having to revise one's own plans would be compounded by the adverse reactions sure to be generated by any additional delay of construction and correspondingly increased costs. Counterbalancing of such bureaucratic pressures is at the heart of the purpose of public hearings.

Nor can the Authority now claim that the work has progressed too far for additional hearings concerning the proposed Farragut North Station. It is clear that a proper hearing was the responsibility of the Authority. And, considering the few potentially involved properties in the area, it is conceivable that as early as the Fall of 1967, but certainly by the Fall of 1969, the Authority's options were sufficiently narrowed to permit the Board's solicitation of the views of the plaintiffs and similarly situated parties. The plaintiffs are entitled to a public hearing conducted by the Board and *de novo* consideration by the Board of the CABA proposal.

## THE FINANCIAL PLAN

With respect to the approved Financial Plan, as amended, November 20, 1969,[32] the plaintiffs challenge its validity on several grounds. They allege that it does not contain the specifications required by the Compact; that the Plan is inadequate because the proposed revenue bonds cannot be marketed within the six percent rate prescribed by the Compact; that the required Service Agreements and other financial agreements are not fully completed; that pending litigation in Virginia challenging limitations on bond interest rates may interfere with bond marketing; and that bond referenda were illegal because the Financial Plan was not yet available for public perusal.

The Authority Compact states that " * * * as far as possible, the payment of all costs shall be borne by the persons using or benefiting from the

---

28. Affidavit of Mathew Platt, Assistant Director, Office of Planning of WMATA, attached to Suppl. Statement of Material Facts as to which Defendant Contends There Is No Genuine Issue, at 2.

29. Answer 21 to plaintiffs' interrogatories, at p. 6.

30. December 11 and 24, 1969. Platt affidavit at p. 3.

31. Answer 11 to plaintiffs' interrogatories, at p. 4.

32. Defendant WMATA's Exhibit filed October 19, 1970.

Authority's facilities and services and any remaining costs shall be equitably shared among the * * * participating * * * governments in the Zone. The allocation among such governments of such remaining costs shall be determined by agreement among them * * *." Art. VII, § 16.

Article VII, § 17 provides that

"(a) The Authority, in conformance with said policy, shall prepare and adopt a plan for financing the construction, acquisition, and operation of facilities specified in * * * [the] * * * mass transit plan * * *. Such [sic] of financing shall specify the facilities to be constructed or acquired, the cost thereof, the principal amount of revenue bonds, equipment trust certificates, and other evidences of debt proposed to be issued, the principal terms and provisions of all loans and underlying agreements and indentures, estimated operating expenses and revenues, and the proposed allocation among the * * * participating * * * governments of the remaining costs and deficits, if any, and such other information as the Commission may consider appropriate.

"(b) Such plan of financing shall constitute a proposal to the interested governments for financial participation and shall not impose any obligation on any government and such obligations shall be created only as provided in Section 18 of this Article VII."

Further, "with respect to the District of Columbia and the federal government, the commitment or obligation to render financial assistance shall be created by appropriation or in such other manner, or by such other legislation, as the Congress shall determine. If prior to making such commitment by or on behalf of the District of Columbia, legislation is enacted by the Congress granting the governing body of the District of Columbia plenary power to create obligations and levy taxes, the commitment by the District

of Columbia shall be by contract or agreement between the governing body of the District of Columbia and the Authority, * * * Art. VII, § 18(c).

Article IX, § 27 provides in pertinent part that

"The authority may borrow money for any of the purposes of this Title, may issue its negotiable bonds and other evidences of indebtedness in respect thereof and may mortgage or pledge its properties, revenues and contracts as security therefor.

"All such bonds and evidences of indebtedness shall be payable solely out of the properties and revenues of the Authority. * * *"

In addition, "* * * The bonds may be secured by a pledge of all or any part of the property, revenues and franchises under its control. Bonds may be issued by the Authority in such amount, with such maturities and in such denominations and form or forms, whether coupon or registered, as to principal alone or as to both principal and interest, *as may be determined by the Board.* * * *" (Emphasis added.) Art. IX, § 31.

Regarding interest rates, "Bonds shall bear interest at a rate of not to exceed six percent per annum payable annually or semiannually." Art. IX, § 35.

The Court has already noted, at p. 799, *supra,* that plaintiffs have standing, as taxpayers to bring suit with regard to the Financial Plan. However, "* * * a party may have standing in a particular case, but the federal court may nevertheless decline to pass on the merits of the case * * *." Flast v. Cohen, *supra,* 392 U.S. at 100, 88 S.Ct. at 1952, 20 L.Ed. 947. The issues may be barred from judicial scrutiny. They may be political or absolutely discretionary, or subject to only partial judicial review.

The scope of reviewability in this instance is limited to a consideration of whether the Authority's actions did or

might result in the "illegal disposition of the moneys of the * * * [District] * * * or the illegal creation of a debt" which the plaintiffs hold in common with other District taxpayers, Crampton v. Zabriskie, *supra*, 101 U.S. at 609, 25 L. Ed. 1070; or whether the Authority's actions were *ultra vires* or fraudulent, Downing v. Ross, *supra*, 1 App.D.C. at 259–260, or arbitrary or capricious, totally lacking in factual basis. United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961). Berman v. Parker, *supra*, 348 U.S. at 32–36, 75 S.Ct. 98, 99 L.Ed. 27. See also, Mamer v. D. C. R. L. A., 109 U.S.App.D.C. 87, 284 F.2d 221 (1960); Donnelly v. D. C. R. L. A., 106 U.S.App.D.C. 99, 269 F.2d 546 (1959), rehearing denied (1959); Smart, et al. v. Graham, 179 Md. 476, 20 A.2d 574 (1941).

Because of the wide discretion which must be accorded an agency entrusted with the task of administering this complex, expensive, multi-jurisdictional, and time-consuming project the Court's concern cannot be with the wisdom or the relative merit of the Authority's decisions and possible alternatives. We need not find that the actions of the Authority are the only reasonable ones or that this Court would have reached the same result. Udall v. Tallman, et al., 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). See also, D. C. Federation of Civic Ass'ns, Inc., et al. v. Volpe, 311 F.Supp. 754 at 761 (D.D.C., filed Aug. 3, 1970).

The Court concludes that sufficient basis exists to meet these very narrow limits of the Court's concern with the overall adequacy of the Authority's Financial Plan and the Authority's actions with regard to that Plan.

▮ A reading of the Financial Plan and its attachments clearly indicates that the requirements of Article VII, § 17 of the Authority Compact, *supra* at 805, are satisfied. Plaintiffs' allegation of lack of specificity is a mere conclusion of law devoid of reference to specific omissions.

As to the overall adequacy of the Financial Plan, particular note is taken of House Report No. 1914, at 26, *supra*, n. 11 at p. 799, which supported the Compact guidelines for the Authority's financial planning:

"(c) * * * Finally, the assertion that the Authority may not have the capacity to finance the regional system is unpersuasive. * * * [G]uidelines were set down by the Congress for financing the regional system in both the 1960 and 1965 acts. * * * In this connection, counsel for the JTC submitted for the record a letter opinion dated August 1, 1966, from the New York law firm of Hawkins, Delafield & Wood * * * one of the leading bond counsel in the country and [which] earlier prepared a study for the agency with respect to the problems of financing by an interstate Authority. * * * [T]he firm expressed the opinion that the pending legislation 'provides adequate powers for the proposed Authority to discharge its necessary functions and carry out the declared purposes of the joint resolution' and further stated that the legislation 'provides a sound and workable basis for the proposed Authority to develop a financing program through the issuance of revenue bonds.'" [33]

Since the Authority's Plan apparently meets the criteria Congress envisioned when it approved the Compact the Court has no cause to interfere. The debates accompanying approval of the Authority

---

33. JTC is the Joint Transportation Committee, a joint commission to study passenger carrier facilities and services in the Washington Metropolitan Area, established by resolutions adopted by the Legislatures of Maryland (Maryland H.J. Res. 12, April 12, 1954) and Virginia (Virginia H.J.Res. 77, March 22, 1954) and the Board of Commissioners of the District of Columbia (District of Columbia Order 54–2065, September 27, 1954).

Compact [34] indicate that the Congress put great reliance on the restriction of the Authority's power in proposing, rather than prescribing, a Financial Plan for consideration of the signatories. Art. VII, § 17(b), *supra.* The Congress, on behalf of itself and the District, Neild v. District of Columbia, *supra,* then makes the necessary obligations. Congress' grant of appropriations is sufficient evidence that the Financial Plan itself is acceptable to the District.[35] The Court will not probe the wisdom of Congressional judgment in this regard. Unlike Dilday v. Beaufort County Board of Education, 273 N.C. 679, 161 S.E.2d 108 (1968), cited by plaintiffs, there is no allegation that the Congress, in approving the Authority's proposals, failed to consider any criteria required by law. Here, the only claim is that the conclusion reached by Congress was wrong. Further, it may be assumed that the Congress is prepared to support its commitment. Indeed, "Plaintiffs do not contend that the Authority is not or ultimately will not be able to finance its activities." [36]

■ While plaintiffs couch their objections to the bond interest rates in terms of failure to comply with the Authority Compact, such complaints are, in essence, challenges to the wisdom of Congress—both as a national legislature and as the legislature for the District. Whether or not the maximum interest rate is sufficient is a question of congressional judgment, and there is adequate evidence in the public record that Congress made the necessary analysis of alternatives. See especially, H.R.Rep.No. 1914, at 26, *supra.* Significantly, broad discretion has also been vested in the Authority Board. Art. IX, § 31, *supra.*

Whether the interest rates recommended to the Congress will be sufficient if less than six percent is equally a question for legislative judgment. And since the Authority has the power to issue bonds at a full six percent rate, Art. IX, § 35, *supra,* the Court cannot at this time say that the Authority will not in fact do so.

Finally, the Court's reading of the Authority Compact leads it to conclude that it is unnecessary to examine further the allegations that all of the Service Agreements [37] have not been negotiated; that at least one of the political subdivisions has entered into only an Interim, as opposed to a final Capital Contributions Agreement; [38] that pending litigation in Virginia challenging limitations on bond interest rates may interfere with bond marketing; and that the bond referenda were conducted prior to the adoption of the Financial Plan.

■ The Financial Plan is no more than "a *proposal* to the interested governments." Art. VII, § 17(b), *supra* at 20. (Emphasis added). The only financial prerequisites to a satisfactory Mass Transit Plan are "*anticipated* capital costs," Art. VI, § 13(a) (5), and "*estimated* operating expenses and revenues * *. *." Art. VI, § 13(a) (6). (Emphasis added.) And, the Financial Plan speaks only of Agreements "substantially" as indicated.[39] Further, it supplies only a very general outline of the various financing techniques to be employed. The votes of approval by the various interested political subdivisions and by Congress affirm this Court's judgment that the Technical Reports of December 1967 [40] were sufficient to meet the required estimates. Similarly, neither the Authority Compact language nor any other document brought to the attention of

34. See especially the colloquy between Rep. Whitener and Rep. Mathias. 112 Cong. Rec. 25683–4 (1966).

35. Pub.L. 91–143, 83 Stat. 320 (December 9, 1969).

36. Plaintiffs' Points and Authorities in Opposition to Defendant WMATA's Motion to Dismiss and/or for Summary Judgment, at 12.

37. Financial Plan, Clause 7.

38. Affidavit of Warren D. Quenstedt, par. 3, attached to defendant WMATA's memorandum in opposition to plaintiffs' motion for summary judgment.

39. Financial Plan, Clause 7.

40. Defendant WMATA's Exhibit filed October 19, 1970.

the Court indicates that the adoption of a completed Financial Plan is a prerequisite to bond referenda. Nor do plaintiffs have standing as District taxpayers to challenge bond referenda in Maryland or Virginia.

■ Article VII, § 16 provides only that *"as far as possible * * * remaining* costs shall be equitably shared among the federal, District of Columbia and participating local governments in the Zone." (Emphasis added.) Significantly, "[t]he allocation among such governments of such remaining costs shall be determined by agreement among them. * * *." Art. VII, § 16. This stated policy clearly reflects a recognition that the complex legal and financial obstacles to completion of the system demand an administrative flexibility that allows limited tradeoffs as opposed to perfect equitable apportionment of obligations in each type of financing instrument. See Lewis v. City of South Hutchinson, 162 Kan. 104, 174 P.2d 51 (1946).

With respect to these challenges, the presence of District citizens on the Authority Board, equal in number to those of Maryland and Virginia, must be relied upon, until such time as Congressional action makes possible more effective citizen participation in matters such as this, to guarantee that the community's interests are not jeopardized.

## MOTION OF DISTRICT OF COLUMBIA, ET AL., TO DISMISS

■ Assuming that the plaintiffs are entitled to the relief sought, it is difficult to conceive that the District of Columbia, and Walter E. Washington and Kenneth Back as the Commissioner and the Financial Officer, respectively, are not necessary and indispensable parties. Plaintiffs seek to restrain the District and its officials from further disbursing funds already obligated, and from obligating additional funds of the District until the deficiencies alleged in this action are remedied.

Crucially, the Authority is the result of "a regional instrumentality, * * * a common agency of each signatory party * * * "[41] Thus, both with respect to potential remedies and possible jurisdictional problems, it is clear that the municipality of the District of Columbia represents "an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Shields v. Barrow, 17 How. 130, 139, 15 L.Ed. 158 (1854). See also Provident Tradesmens Bank & Trust Co. Admn. v. Patterson, et al., 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); Roberts v. Bradfield, *supra*, 12 App.D.C. at 458, 459. See also, Rule 19, Federal Rules of Civil Procedure.

The nature of the District's relationship to the station access dispute was recently underlined by the policy decision of the District of Columbia City Council to henceforth assist in the review of District subway station design and location by Board members representing the District.[42]

As to the financial issues it has long been recognized that "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." Massachusetts v. Mellon, *supra*, 262 U.S. at 486, 43 S.Ct. at 601; Crampton v. Zabriskie, *supra*, 101 U.S. at 609, 25 L. Ed. 1070; Downing v. Ross, *supra*, 1 App.D.C. at 254; Roberts v. Bradfield, *supra*, 12 App.D.C. at 459, 460.

The motion to dismiss will, accordingly, be denied.

Counsel for plaintiffs will submit an appropriate order by November 30, 1970.

## ORDER AND JUDGMENT

Upon consideration of the Motion of the Defendants District of Columbia, Walter E. Washington, and Kenneth Back

---

41. Compact, *supra*, Art. II, § 2.

42. Washington Evening Star, Nov. 6, 1970, p. B4.

to Dismiss; the Motion of the Defendant Washington Metropolitan Area Transit Authority (hereinafter referred to as "WMATA") to Dismiss, or, in the alternative, for Summary Judgment; and the Plaintiffs' Motion for Summary Judgment; and all memoranda and exhibits in support thereof and in opposition thereto; and counsel having been heard thereon; and this Court having, on November 24, 1970, entered a Memorandum Opinion which constitutes the Court's findings of fact and conclusions of law with respect to the aforesaid Motions; it is, by the Court,

ORDERED, ADJUDGED AND DECREED:

1. Plaintiffs have standing to bring this action as respects the Mass Transit Plan hearing issues as and on behalf of persons whose property interests may be acquired for, or who may be displaced by, subway construction and as respects the Financial Plan issues as and on behalf of District of Columbia taxpayers. This action shall be deemed a class action as respects these two classes of persons, and the prerequisites of F.R. Civ.P. 23(a) and 23(b) (1) and (2) are found to have been met. Defendant WMATA's Motion to Dismiss the Complaint for Plaintiffs' lack of standing to bring a class action is denied.

2. Defendants District of Columbia, Walter E. Washington, and Kenneth Back are found to be indispensable parties to this action, and the motion of those Defendants seeking their dismissal as parties hereto is denied.

3. The Mass Transit Plan of the Defendant, WMATA, adopted on March 1, 1968, has been adopted in conformance with the requirements of the Compact, but any future WMATA action with respect to said Plan or its implementation shall be done in accordance with the terms of paragraphs 6, 7 and 8 of this Order to the extent that it may be applicable.

4. There being no genuine dispute as to any material fact necessary for deter-

mination of Plaintiffs' Motion for Summary Judgment as the same relates to hearing requirements as described in paragraphs 6, 7 and 8 hereof, said Motion to such extent is hereby granted, and the Motion of Defendant WMATA for Summary Judgment as same relates to said hearing requirements is hereby denied.

5. Material outside the pleadings having been presented to, and considered by, the Court, and there being no genuine dispute as to any material fact, Defendant WMATA's Motion to Dismiss the Complaint for failure to state a claim for relief as respects the Financial Plan issues hereby is treated as a Motion for Summary Judgment and is granted, and judgment thereon is entered for Defendants.

6. Defendant WMATA hereafter may not, and shall not, (a) acquire, except by voluntary conveyance, any privately-owned real property or interest therein for a subway station or its access points or for any other use or purpose authorized by the Compact, (b) displace any private person or private establishment, except with their voluntary agreement, or (c) enter into a contract with a contractor to construct any subway station or its access points, or other transit facilities which may result in the involuntary displacement of any private person or private establishment, unless and until the Board of Directors of WMATA have adopted a mass transit plan, or an alteration, revision, or amendment thereof, in conformance with and subject to the provisions of Section 15 of the Compact which specifies the proposed location of any such subway station, station access point or other transit facility and which indicates the property which may possibly be acquired or affected and the private persons or establishments which may possibly be displaced.

7. Hearings in respect of each such plan shall be conducted by WMATA's Board of Directors and shall be held as early in the planning process as may be practicable. WMATA shall take appropriate steps including,

but not restricted to, posted notices on all possibly affected premises and written notice to all owners of possibly affected premises and street level commercial businesses to be displaced as indicated by local real estate tax assessment records, advising of such hearings. Such notices shall be given at least 30 days prior to the date of the proposed hearings to those persons whom it reasonably appears may have their property taken or who may be displaced by such plan as then proposed; *Provided,* that with regard to the already scheduled hearings for the Farragut North and Gallery Place Metro Stations, posted and written notices be provided promptly and the record of those scheduled hearings be kept open for additional comments and proposals for a period of thirty days from the date of mailing and posting of notices. All affected persons must advise WMATA in writing on or before such already scheduled hearings, or within ten days of the date of mailing of written notices, whichever is later, that they desire to file comments or proposals and be heard thereon. WMATA shall announce at the scheduled hearings the date set for reconvening the hearings to consider such comments or proposals and such further hearings shall be held without further notice or posting.

8. At such hearings, WMATA shall provide persons who may possibly be affected or displaced by such proposed plan with an opportunity (a) to comment upon the details thereof, (b) to offer alternative proposals with respect to the location of any subway station, station access point, other transit facility, or property to be acquired as proposed therein, and (c) to respond to criticisms by WMATA and its employees and agents of such alternative proposals. In reaching its determinations, WMATA's Board of Directors shall give fair and *de novo* consideration to the comments and alternatives proffered by interested persons. In seeking by voluntary agreement to acquire private property or interests therein or to secure the displacement of private persons and establishments,

WMATA shall advise the sellers or displacees of their right to a hearing as provided herein and the fact that such right will be waived by their voluntary agreement with WMATA respecting the disposal of their property or their displacement.

9. Defendant WMATA is taxed with Plaintiffs' taxable costs.

### AMENDMENT TO ORDER AND JUDGMENT

Upon joint application of counsel for Plaintiffs and counsel for Defendant WMATA, and there being no objection thereto, paragraph 7 of the Order and Judgment heretofore entered on January 6, 1971, is hereby amended in the interest of clarity to read as follows:

7. Hearings in respect of each such plan shall be conducted by WMATA's Board of Directors and shall be held as early in the planning process as may be practicable. WMATA shall take appropriate steps, including, but not restricted to, posted notices on all premises possibly affected by the proposed plan and written notice to all owners of such premises, as indicated by local real estate tax assessment records, and to the owners of street level commercial businesses to be displaced from such premises, as indicated by the record of occupancy permits maintained by the Permit Branch, Department of Economic Development of the District of Columbia or local income tax records, advising of such hearings. Such notices shall be given at least 30 days prior to the date of the proposed hearings to those persons whom it reasonably appears may have their property taken or who may be displaced by such plan as then proposed; *provided,* that with regard to the already scheduled hearings for the Farragut North and Gallery Place Metro Stations, posted and written notices be provided promptly and the record of those scheduled hearings be kept open for additional comments and proposals for a period of 30 days from the date of delivery or mailing and posting of notices. All affected persons must advise WMATA in writing on or before

such already scheduled hearings, or within 10 days of the date of delivery or mailing of written notices, whichever is later, that they desire to file comments or proposals and be heard thereon. WMATA shall announce at the scheduled hearings the date set for reconvening the hearings to consider such comments or proposals, and such further hearings shall be held without further notice or posting.